CENTRAL BANK OF KANSAS CITY et al. v. THAYER, Appellant.

Division Two, July 16, 1904.

1. FRAUD: Limitations: Knowledge: Burden. The burden is on the person denying that the fraud is barred by the statute of limitations, to show that he did not have knowledge of the fraudulent transaction until within the period of limitation fixed by the statute.

2. ———: ———: ———: Law Case. A finding by the referee, in a suit by the receiver of a bank to recover from the former cashier money by him wrongfully appropriated to his own use, that the cashier, in abstracting the money of the bank and using it to pay himself for stock which he owned and turned

over to the bank, acted without the approval or knowledge of the other officers of the bank, will be approved on appeal, if there is any substantial evidence to support it. And there being such evidence, the statute of limitations did not begin to run in his favor until the transaction was discovered by the receiver.

3. ———: ———: ———: Concealment: Book Entries. The books of a bank are, at least, prima facie evidence of knowledge on the part of the bank and its officers of any fraudulent transaction by its cashier. But when those entries are made in such a way as to conceal their real character and to deceive and mislead an ordinarily intelligent and experienced banker, as they were in this case, they are not notice to the bank.

4. EVIDENCE: Waiver of Incompetency: Deposition. A party to a suit can not testify as to any arrangement or contract he may have made with a deceased agent or officer of a corporation that is the opposite party. Nor is the incompetency of such party to the suit waived by the opposite party's introducing in evidence, as an admission, the deposition of such deceased officer or agent, taken in another suit, while that agent was yet living.

5. ———: Deposition in Another Suit. A deposition taken in another suit can not be used at the trial of the suit at bar, if the parties and issues in that suit were not the same as in this, nor can it be used in any event unless the deposition was filed in the suit on trial and notice given of its intended use.

Appeal from Jackson Circuit Court.—*Hon. Edward P. Gates*, Judge.

AFFIRMED.

*L. C. Boyle, I. N. Watson* and *W. W. Woods* for appellant.

(1) "The rule appears to be well settled in the United States that a corporation may, unless prohibited by statute, purchase its own stock, or take it in pledge or mortgage." Cook on Corporations, secs. 312, 314, 282; St. Louis Rawhide Co. v. Hill, 72 Mo. App. 148; Chitland v. Ins. Co., 86 Ill. 220; State v. Smith, 48 Vt. 266; Williams v. Savage Mfg. Co., 3 Md. Ch. 418; Bank v. Bruce, 17 N. Y. 507; Bank v. Fox, 3 Blatchf. 431;

Vail v. Hamilton, 85 N. Y. 453; Company v. Haven, 101
Mass. 398; Ralston v. Bank, 112 Cal. 218; Bank v. Wick-
arsham, 99 Cal. 635; Taylor v. Exporting Co., 6 Ohio
176; Clapp v. Peterson, 104 Ill. 26; Dupee v. Water
Power Co., 114 Mass. 37; New England Tr. Co. v. Ab-
bott, 162 Mass. 148; Railroad v. Marseilles, 84 Ill. 145;
Bank v. Burch, 141 Ill. 519; Ins. Co. v. Swigart, 135 Ill.
150; Roan v. Winn, 93 Mo. 503; Morgan v. Lewis, 46
Ohio St. 1; Thompson v. Moxey, 47 N. J. Eq. 538; Bla-
lock v. Mfg. Co., 64 Minn. 307; Cook on Corporations
(4 Ed.), secs. 309-311; Thompson, Commentaries on
Law of Corporations, secs. 2056 and 2068. (2) There
was no evidence to support the finding by the referee
that defendant abstracted the sum of $5,100 from the
funds of the bank without the knowledge of the manag-
ing officers of the bank. The president of the bank was
the only managing officer who denied knowledge of this
transaction, and this, in the face of his sworn statements
made to the Secretary of State, in which this stock is
shown as an asset of the bank. (3) The transaction
having occurred more than five years before the insti-
tution of any suit, is barred by the statutes of limita-
tions, because the transaction was open, visible and un-
concealed, and was put upon the books of the bank at
the time the transaction occurred, and the books were
open to the inspection of the officers and stockholders
of the bank. Under these facts there was no conceal-
ment which would arrest the running of the statute of
limitations. "It is an invariable rule that the fraud
must have been one which was concealed from the plain-
tiffs by the defendant, or which was of such a character
as necessarily implied concealment." 2 Wood on Limi-
tations (2 Ed.), sec. 276, p. 712; Norris v. Haggin, 136
U. S. 386; Martin v. Smith, 1 Dillon 97; Black v. Black,
68 Pac. 666; 19 Am. and Eng. Ency. of Law, 251; Carr
v. Hilton, 1 Curt. 230; s. c., 1 Curt. 399; Troup v. Smith,
20 Ill. 47; Loomis v. Railroad, 165 Mo. 469; Bent v.
Priest, 86 Mo. 486. (4) The directors and officers of a

bank are not trustees of an express trust, but an implied trust, or, more strictly speaking, they occupy the relation of principal and agent. Kane v. Bloodgood, 7 Johns. Ch. 90; Landis v. Saxton, 105 Mo. 486; Williams v. Hilliard, 38 N. J. Eq. 1; Cooper v. Hill, 94 Fed. 590; Hayden v. Thompson, 36 U. S. App. 362, 71 Fed. 69; Briggs v. Spalding, 141 U. S. 147; Spering's Appeal, 71 Pa. St. 11; Wallace v. Bank, 89 Tenn. 630 (15 S. W. 448); Hughes v. Brown, 88 Tenn. 578 (13 S. W. 286); Allen v. Curtis, 26 Conn. 456; Ryan v. Railroad, 21 Kan. 365; Commissioners v. Reynolds, 44 Ind. 509; Company v. Gibbs, L. R. 5 H. L. 480. (5) The statute of limitations runs against all implied trusts. Smith v. Records, 52 Mo. 581; Smith v. Watkins, 56 Mo. 564; Buren v. Buren, 79 Mo. 542; Bent v. Priest, 86 Mo. 486; Saxton v. Landis, 105 Mo. 486; Loomis v. Railroad, 165 Mo. 469; Callan v. Callan, 74 S. W. 968. (6) It has been ruled a number of times that the directors and officers of a corporation may interpose the statute of limitations when sued by the corporation to compel them to account for assets misappropriated by them, or to hold them liable for losses caused by their wrongful or unauthorized acts or by their negligence. Clark & Marshall on Corporations, sec. 755; Saxton v. Landis, 105 Mo. 486; Williams v. Hilliard, 38 N. J. Eq. 373; Hughes v. Brown, 88 Tenn. 590; Bank v. Wallace, 89 Tenn. 630; Cooper v. Hill, 94 Fed. 584; Priest v. Bentley, 86 Mo. 486; Spering's Appeal, 71 Pa. St. 11; Kane v. Bloodgood, 7 Johns. Ch. 90; Haydon v. Thompson, 71 Fed. 69; Watts' Appeal, 78 Pa. St. (7) The burden of proof rests upon the plaintiff to establish the exception pleaded in order to escape the defense of the statute of limitations. Mason v. Henry, 152 N. Y. 529; 2 Wood on Lim. (2 Ed.), 712; Woods v. Carpenter, 101 U. S. 140; Stearns v. Hague, 7 How. (U. S.) 819; Buckner & Stanton v. Calcote, 28 Miss. 432; Nutt v. Hamlin, 8 Allen 130; Darnold v. Simpson, 114 Fed. 368; School District v. Deweese, 93 Fed. 602; Shelby County v.

Bragg, 135 Mo. 291; Callan v. Callan, 74 S. W. 968. (8) There was no evidence of any concealment in this case, and there were no facts found by the referee showing any concealment on the part of the defendant, but, on the contrary, the plaintiff's evidence itself shows that there was no concealment whatever of the transaction. (9) What amounts to discovery of fraud under our statute is fully stated in Martin v. Smith, 1 Dillon 98. See, also, Kitchen v. Railroad, 69 Mo. 224; Shelby County v. Bragg, 135 Mo. 291; Callan v. Callan, supra; Wood v. Carpenter, supra. (10) The court erred in refusing to permit Thayer to testify under what arrangements he purchased this stock in 1888, because the plaintiff had introduced his testimony taken in another case covering the very transaction in question, and having introduced that testimony waived the right to object to Thayer's testifying on the ground that Hamilton, the cashier, was dead. Tomlinson v. Ellison, 104 Mo. 105; Ess v. Griffith, 139 Mo. 329; In re Soulard, 141 Mo. 642; Borgess Inv. Co. v. Vette, 142 Mo. 571, 168 Mo. 99; Tierney v. Hannon, 81 Mo. App. 491. (11) The court erred in excluding the deposition of P. C. Cowling, taken in another case, because the exclusion was by the referee, and not by the court, and therefore was sufficient notice before the close of the case to allow plaintiff to meet the same if they desired.

*Peak & Strother* and *Trimble & Braley* for respondents.

(1) A bank, in the insolvent condition that this evidently was, had no authority in law to buy its own stock except for the purpose of realizing on a debt which could not otherwise be collected, or for the purpose of protecting itself against some such loss. 1 Thompson on Corporations, sec. 1107; 2 Thompson on Corpora-

tions, secs. 2054-2057; 3 Thompson on Corporations, sec. 3276. (2) The agency or trusteeship of the appellant was a general and a continuing one. No reports or settlements were made, demanded or expected during the continuance of his agency. The other officers of the bank were under no obligation to the appellant to examine the books of the bank to ascertain whether or not he, the appellant, had been perpetrating frauds upon the estate in his charge. The evidence shows, and the referee found, that the fraud was not known to the other officers of the bank, and that no knowledge of any fact which would put them upon inquiry was brought home to them, and that the facts constituting the fraud were not discovered until after the appointment of the receiver. Under these circumstances the cause of action did not accrue and the statute of limitations did not begin to run until the receiver discovered the fraud. R. S. 1899, secs. 4271-4273; Hopkins v. Hopkins, 4 Strobhart's Eq. (S. C.) 213; Parris v. Cable, 5 Rich., Eq. (S. C.) 470; Patterson v. Lilly, 90 N. C. 82; Northcote v. Caspur, 6 Ired. Eq. (N. C.) 317; Davis v. Boydin, 123 N. C. 283 (31 S. E. 492); Ryan v. Railroad, 21 Kan. 404; Perry v. Smith, 31 Kan. 423; Guernsey v. Davis, 73 Pac. 101; Mechem on Agency, sec. 533; Moore v. Waco Bldg. Assn., 45 S. W. 977; Riddel v. Whitehill, 135 U. S. 621; Lawrence v. Sterns, 79 Fed. 884; Bank v. Wade, 84 Fed. 10; Morgan v. King, 63 Pac. 416; Ellis v. Ward, 25 N. E. 530; Foley v. Jones, 52 Mo. 67; Jones v. Bank, 76 N. W. (Mich.) 324. The Kansas statute is like ours. G. S. Kansas (Dassler), sec. 4446. (3) Under the Missouri statute of limitations it is not necessary that the plaintiff should prove a concealment of the fraud to prevent the statute from running, but it is necessary that the defendant should prove a discovery of the fraud in order to start the statute to running. R. S. 1899, secs. 4271, 4273. (4) The trial court did not err in refusing to permit Thayer to testify as to the arrangements that he claimed to have made with the bank

at the time that he and Sponable paid the $5,100 into the bank, inasmuch as whatever arrangements he made, if any, were made with one Hamilton, the then cashier of the bank, who was dead at the time of the trial. It is well established that a party to a suit can not testify as to any contract or arrangement that he may have made with the opposite party who is dead, or, if the opposite party be a corporation, as in this case, he can not testify as to any arrangement or contract that he claims to have made with an agent or officer of such corporation who is dead at the time of the trial. Williams v. Edwards, 94 Mo. 447; McCormick Harvesting Machine Co. v. Heath, 65 Mo. App. 461; Nelson v. Railroad, 66 Mo. App. 647. (5) The respondents did nothing to waive the incompetency of the appellant as a witness to testify to an alleged arrangement or transaction had between him and one Hamilton, then cashier of the bank, but who was dead at the time that the appellant tried to testify as to such alleged transaction. (a) Respondents never took the deposition of the appellant in this case nor in any way called him as a witness. What the respondents did is this: They proved upon the trial certain declarations of the appellant made by him some nine years before, whilst testifying as a witness in another case. The proof of these declarations was made by offering the bill of exceptions preserved in that case, and which contained the testimony of the appellant given in that case. (b) The declarations of appellant so put in evidence by respondents did not refer to or have any bearing upon the alleged arrangement or transactions which appellant offered on the trial of this case to testify that he had made with Hamilton. No such arrangement or transaction was in any way hinted at and none was ever heard of until the appellant, long after Hamilton's death, filed his answer in this case. The doctrine announced in the cases cited by appellant does not apply to this question. There was nothing done by the respondents in this case to waive the

incompetency of the appellant to give the testimony he offered to give. Nelson v. Railroad, 66 Mo. App. 652; Bank v. Payne, 111 Mo. 291. (6) The trial court did not err in excluding the deposition of P. C. Cowling, which was offered by the appellant: First, because the said deposition was taken in a case where the parties were not the same as in this; second, because the issues in that case were not the same as those in this case; Third, because the said deposition was never filed in this case, and no notice ever given by the appellant that he desired or expected to read said deposition. Any of the above reasons would be sufficient for excluding the said deposition and sustaining the ruling of the referee. Leslie v. Coal Mining Co., 110 Mo. 31; Borders v. Barber, 81 Mo. 643.

BURGESS, J.—In 1888, the Central Bank of Kansas City was doing a banking buisiness, as a Missouri corporation, with a capital stock of $100,000. The defendant George E. Thayer, having acquired stock in the bank, was on September 7, 1888, elected vice-president of the bank, and on December 5, 1888, elected as its cashier, and continued to act in that capacity until the bank ceased to do business on the fifth of March, 1891, when, by the action of its stockholders, the bank went into liquidation, and turned over all of its assets to the defendant Thayer for the purpose of winding up its affairs. He accepted the trust and entered upon the discharge of his duties and from that time on continued to do so until the appointment of Mr. Strother as receiver on December 5, 1898. On September 16, 1899, this suit was instituted.

The petition alleges:

"That on, to-wit, the fifth day of December, 1888, the said defendant was, by the board of directors of the plaintiff bank, elected cashier of the plaintiff bank, and thereupon entered upon the duties of such office and continued to act as such cashier continuously thereafter

until the — day of ——, 1891, on which day, by the votes of the holders of the majority of the stock of the plaintiff bank, said bank ceased to do an active banking business, and went into voluntary liquidation for the purpose of finally winding up and settling up its affairs, and from the last-mentioned day, and from said fifth day of December, 1888, said defendant was actively engaged in the management of the affairs of the plaintiff bank, and was a director, stockholder and cashier thereof, and after said bank ceased its active operations had in his charge and control all the books, papers, moneys, assets and effects and property of every kind of the plaintiff bank continuously up until the appointment of said receiver as aforesaid; and during all the time it was the duty of said defendant as such cashier, officer and director of the plaintiff bank and by reason of the fiduciary position which he occupied with the plaintiff bank and other stockholders thereof by reason of the premises, to protect the interests of the plaintiff bank, and all its property and real estate, and to see that such property and real estate and all the assets and effects of the plaintiff bank were kept and preserved for the use and benefit of said bank and the stockholders therein.''

The answer of the defendant Thayer in respect to the same matter states:

''This defendant admits that he was elected cashier of said bank December 5, 1888, and was such cashier until the appointment of said Strother as receiver as above stated . . . and this defendant avers and says that on December 5, 1888, he was duly and legally elected cashier of plaintiff bank at a salary of $150 per month; that the amount of the salary of the cashier of said bank had theretofore been fixed and provided for by the board of directors of the said bank; that up to and including the time the said bank went into voluntary liquidation this defendant had been paid and received his salary as said cashier; that by the by-laws of

the said plaintiff bank the cashier held office until his successor was elected and qualified; that when the said plaintiff bank went into liquidation, as aforesaid, the president and directors thereof directed and instructed this defendant to retain and take possession, control and management of the property, assets and effects of said bank, and to wind up, close out and settle the business and affairs thereof; that said defendant did from said time as cashier of said bank.and under the direction and control of the president and directors of said bank, do and perform all services and work necessary and needful in the closing up, management, collecting and settlement of the affairs and business of said bank until the time of the appointment of plaintiff, Strother, as receiver, and the taking possession by him of the property and effects of said bank, a period from March 5, 1891, to December 5, 1898, of seven years and nine months."

The answer contains the following further allegations:

"And defendant avers and says, that sometime in March, 1891, plaintiff bank, by a vote of a majority of its stockholders, decided to cease its operations as a bank, and to go into voluntary liquidation; that at that time this defendant was its cashier, duly elected, qualified and acting; that at said time said bank was paying as rent for the office in which it did its business, the sum of $250 per month; that the books, papers, assets, property and effects of said bank were at said time, by its board of directors and managing officers, placed in the custody, charge, control and management of this defendant, as cashier, for the purpose of collecting the assets, winding up the business, and transacting all necessary and needful work in closing up the affairs of said bank; that to save said money, and to reduce its expenses, this defendant moved the assets, property and effects of said bank from the expensive offices theretofore occupied and used by it to the office of the Thayer

Commission Company; that this move was made by and under the authority and direction, and with the consent and permission, of the president and directors of said bank; that the property, books and effects of said bank were placed by this defendant in the large vault, at that time rented and used by said Thayer Commission Company, and that the same occupied and filled more than three-fourths of the office and vault of said Thayer Commission Company.''

The petition contains seven counts, and after issue was joined thereon by answer and reply, the trial court, on motion of the defendant, Thayer, duly appointed R. E. Ball, of the Kansas City Bar, referee ''to hear and decide the issues both of law and fact herein.''

The hearing before the referee began on April 13, 1900, and continued from day to day and time to time until February 25, 1901, when the referee filed his report.

The referee found the issues for the plaintiff on the first, second, fifth and sixth counts of the petition, and for the defendant on the other three counts.

On May 28, 1891, whilst Thayer was acting as trustee for the bank in winding up its affairs, the bank, through Thayer, bought at trustee's sale some real estate in Kansas City, Missouri, known in the evidence as the ''Morley property.'' The bank bought in this Morley property at the trustee's sale because it was interested therein as the holder of a junior mortgage. The bank took title by trustee's deed to the Morley property, subject, however, to the lien of a prior deed of trust for $2,500. Immediately upon the purchase of this property by the bank, Thayer, as the trustee of the bank in winding up its affairs, took possession, management and control of the property. About that time Thayer bought the $2,500 note which was secured by the first mortgage on the property. He paid for this note out of his own funds. Sometime afterwards, in March, 1892, the circuit court of St. Louis rendered judgment against

this bank for about $1,825, which is known in the evidence as the "Hilliard judgment." About a year afterwards, in March, 1893, the owner of the Hilliard judgment caused certain real estate in Kansas City, Missouri, to be levied upon by the sheriff and advertised for sale. The property so levied upon was not the Morley property, but was other real estate claimed by the execution creditor to belong to the bank, and claimed by the defendant, Thayer, to belong to him or his wife. Just before the sale of the property under the execution, Thayer arranged with Mr. Hamilton, who was counsel for the execution creditor, to the effect that he, Thayer, would pay up this judgment in full with the understanding, however, that the execution sale should proceed, and that the property should be bid off at the sheriff's sale under the execution by Mr. Hamilton, and that he, Hamilton, was immediately to quitclaim the property to Mrs. S. M. Thayer, the appellant's wife. The property was bid in by Hamilton, and he received the sheriff's deed therefor, and he immediately quitclaimed it as agreed upon, to the appellant's wife. Thayer paid the full amount of the Hilliard judgment to Hamilton, but paid it, not out of his own pocket, but out of the funds of the bank, and instead of having the judgment satisfied of record, he took an assignment of it to the Thayer Commission Company, a business corporation controlled by the appellant, Thayer. The execution was returned not satisfied.

Afterwards, on July 17 of the same year, 1893, Thayer caused an alias execution to be issued on this Hilliard judgment, and levied on the Morley property then owned by the bank subject to the $2,500 deed of trust then held by Thayer. On October 11, 1893, the sheriff sold the property under this alias writ, and Thayer bid it in in the name of one Isaac Niles. Niles was a distant relative of the defendant, and lived in Massachusetts. He knew nothing of the purchase of this property in his name and in fact did not buy it.

The attempt at purchase was by the defendant for his own benefit. The sheriff's deed to Niles was made and delivered to the defendant on October 14, 1893. He withheld it from record until January, 1899.

About two years after the sheriff's sale of the Morley property, and after the delivery of the Niles deed to the defendant, Kansas City passed an ordinance condemning this Morley property for park purposes, and on September 28, 1896, the value of this Morley property was assessed by a condemnation jury at $7,913. A few days after the confirmation of this verdict, to-wit, on December 26, 1896, the defendant caused the trustee under the deed of trust securing the $2,500 note which he held against this property to sell the property under the said deed of trust, and at the sale the defendant bid in the property and caused a trustee's deed to be made to E. F. Swinney, who was president of a bank which held the $2,500 note as collateral to a note of defendant, and who knew nothing of defendant's practices.

Afterwards, on July 20, 1898, the city paid to Mr. Swinney the assessed value of this property, viz., $7,913, and the money was applied to the use of the defendant by the satisfaction of his individual debts which were due to the bank of which Mr. Swinney was president.

After the sale of the Morley property under the Hilliard judgment and the conveying of it by the sheriff to Niles, the defendant Thayer collected all of the rents arising from this Morley property and used the same for his own purposes. The amount of rents that he collected aggregated $2,100.

The referee found that this Morley property belonged to the bank continuously after its purchase thereof in May, 1891, and that the attempts of the defendant Thayer, to buy the same under the Hilliard judgment and under the prior deed of trust which he had bought up, were fraudulent and void as to the bank, and that he, Thayer, neither acquired title to the property nor any rights to the rents arising therefrom, and after giv-

ing him credit for all the money that he had paid out for the first mortgage, and on account of the improvements and taxes on the property, the referee charged Thayer with the balance of the $7,913, which the city paid for the property, and for the rents he had collected and appropriated.

The finding of the referee and the judgment of the trial court thereon against the defendant on the fifth and sixth counts of the petition are the things now complained of and brought here for review.

The fifth count of the petition, after alleging at length the cashiership of the defendant and the fiduciary position occupied by him, and his duty arising therefrom to protect the bank and all its property for the benefit of creditors and stockholders, proceeds to charge:

"That on the thirty-first day of January, 1890, and prior to that time, the defendant was the owner of twenty-five shares of the capital stock of the plaintiff bank of the par value of one hundred dollars per share; and on said last-mentioned day, in violation of his duty as the cashier of the plaintiff bank and in breach of his trust as an officer of the plaintiff bank, and without the knowledge or consent of the plaintiff bank or any of its officers, directors or stockholders said defendant unlawfully, wrongfully and fraudulently took out of the moneys and property of the plaintiff bank the sum of two thousand five hundred and fifty dollars and deposited the same to his individual account with the plaintiff bank and converted the same to his own use; that said defendant took and converted said money of the plaintiff bank to his own use under color of a pretended sale or transfer to the plaintiff bank of twenty-five shares of the capital stock of the plaintiff bank theretofore owned by him, which said pretended sale was made by defendant, from himself as an individual, to himself as cashier of the plaintiff bank, purporting to act for and on behalf of the plaintiff bank, but which pretended sale

was and is absolutely null and void; that by reason of the control of said defendant of the affairs of the plaintiff bank, and by reason of his possession of the books, papers, documents, moneys, assets and effects of the plaintiff bank during all the times aforesaid and by reason of the fraudulent concealment of such transaction by the defendant, said conversion of said sum of money by the defendant to his own use was not known to the plaintiff bank or any of its officers or stockholders, and was not discovered until, to-wit, the — day of ——, 18—, after the appointment of the receiver herein."

The petition then alleges the making of an offer to return to the defendant the twenty-five shares of stock, and a demand for a return of the money converted by him to his own use and renews such offer to return the stock, and asks judgment for the $2,550 of money which he was alleged to have taken out under pretense of the sale of the stock.

The sixth count of the petition after setting out the fiduciary relation which the defendant bore to the bank, and his duties to the bank and its creditors and stockholders to faithfully protect the interests of the bank in respect of all its property, effects and assets, proceeds to charge:

"That, on, to-wit, the thirty-first day of January, 1890, and prior thereto, one J. W. Sponable was the owner of twenty-five shares of the capital stock of the plaintiff bank of the par value of $100 per share; that on said day said defendant, in violation of his duty as cashier of plaintiff bank, and as a trustee for the plaintiff bank and the stockholders thereof, fraudulently and wrongfully took from the assets, moneys and property of the plaintiff bank the sum of $2,550, and deposited the same to the credit of said J. W. Sponable in his individual deposit account with the plaintiff bank; and that thereafter said sum was by said Sponable converted to his own use and wholly lost to the plaintiff bank; that said defendant took said money and depos-

ited it as aforesaid wrongfully and fraudulently, colluding with said Sponable and claiming that the same was the purchase price of the said twenty-five shares of the capital stock of plaintiff bank owned by said Sponable; that said defendant had no power or authority to purchase said shares of stock for the use or benefit of the plaintiff bank, or to use or apply any of the moneys or property of the plaintiff bank for that purpose, and such purchase was beyond the scope of the authority of the defendant, and fraudulent and void; that said pretended and collusive sale of said stock to the plaintiff bank and the said taking of said sum of money by defendant and the deposit thereof to the credit of said Sponable as aforesaid, was not known or discovered by the plaintiff bank, or any of its officers or stockholders, until after the appointment of the receiver herein, as aforesaid.''

The petition then alleges the demand for the repayment of the money so delivered to Sponable and prays judgment therefor.

The answer treats the causes of action set up in the fifth and sixth counts of the petition as one and the same transaction, and in general terms denies that the defendant ever owned the said twenty-five shares of stock in the bank, and denies that J. W. Sponable ever owned the said twenty-five shares in the bank referred to in the sixth count, and denies the pretended sale thereof to the bank, as alleged in the petition, and then proceeds to state as follows:

''Defendant avers and alleges the fact to be that on or about the seventh day of November, 1888, one Parnell C. Cowling was indebted to said plaintiff bank in the sum of $5,100; that to secure said indebtedness the said Cowling had pledged to said bank, as collateral security, $5,000 of the capital stock of said bank; that said indebtedness was past due and the said Cowling was unable to pay the same; that said bank at that time was much in need of money due from Cowling; that

in order that said bank might have and receive the amount of said money, one J. W. Sponable, a stockholder of said bank, and this defendant agreed with the cashier and other directors of said bank, that they would advance from their personal means the amount of money necessary to pay to the bank the debt of the said Cowling, which they thereupon did, and the said bank received of said J. W. Sponable the sum of $2,550, and from this defendant a like sum of $2,550; that by said arrangement the said Sponable and this defendant was to pay said money upon the debt of said Cowling, and should be repaid and reimbursed the same whenever they, the said Sponable and this defendant, should require; that the said bank had the use and benefit of the money of said Sponable, and of this defendant, for a period of one year and three months, without charge or interest, and that on or about the thirty-first day of January, 1890, in accordance with said understanding, agreement and arrangement, the said Sponable and this defendant surrendered to said bank the $5,000 of capital stock held by said Cowling and received from said bank the money which they had advanced thereon.''

The answer then proceeds to allege that the whole transaction was fully known to, understood by and acquiesced in by the bank, its president and directors, and further that everything which the defendant did ''in and about advancing of said money to be applied upon the debt of said Cowling and in the payment and reimbursement to said Sponable and himself of said money, and the surrender and delivery to said bank of said capital stock of said Cowling,'' was known to said bank and to its president and board of directors more than five years before the commencement of this action, and pleads the statute of limitations in bar.

It will be noticed from the pleadings as to the fifth and sixth counts, that the petition alleges that Thayer and Sponable each owned twenty-five shares of the

bank's stock and the answer denies that allegation. The petition further alleges that under a pretended sale of this stock to the bank the appellant took out $2,550 and gave it to himself, and took out $2,550 more and gave it to Sponable. The answer denies that there was any such sale, pretended or otherwise, but states and alleges an arrangement, the substance and effect of which was that the appellant and Sponable advanced to or made a demand loan to the bank of $5,100, each of them furnishing half of the money, and taking the fifty shares of Cowling's stock, then in the hands of the bank, to themselves as collateral security for the loan, with the understanding that they could draw the $5,100 out at any time that they wanted it and return the Cowling stock to the bank. And appellant says in his answer that they did take out the $5,100 and that they surrendered and delivered to said bank "said capital stock of said Cowling."

The parties went to trial upon the issue so presented, viz., as to whether the defendant and Sponable were the owners of this stock and fraudulently unloaded it on the bank and took out enough money from the bank to pay them at the rate of $102 per share for the stock, or whether they did what the answer alleges that they did, viz., reimbursed themselves for the loan previously made to the bank, and returned the Cowling stock which they held as security therefor.

The referee found this issue for the plaintiff.

Thomas R. McClintock, who was a creditor of P. C. Cowling, brought a suit against Cowling, by attachment and attached Cowling's stock in this bank, obtained judgment and the sheriff sold the stock, and McClintock bought it at the sale. He afterwards demanded a certificate from the bank for the fifty shares of Cowling stock, and the bank refused to give it, and McClintock sued the bank for the conversion of the fifty shares of stock. The bank filed an answer to the suit, in which it alleged, among other things, that the bank held Cow-

ling's note and held these fifty shares of stock as collateral security for this note; that after the maturity of Cowling's note and his failure to pay the same "George E. Thayer offered to pay for said stock $102 per share, a price larger than either the par or market value thereof, and the bank agreed to accept this offer through J. M. Hamilton, at that time its cashier, but to avoid all possible question said Cowling consented and agreed with said bank and said Thayer that said stock should be sold to said Thayer at and for said price and the proceeds of said sale indorsed on the note; . . . that at the time of his purchase said Thayer did not know and was not informed and had no reason to suppose that said stock had been attached, but bought the same in good faith and without notice and for a valuable consideration."

Upon the trial of said McClintock case said Thayer, the appellant, was a witness and testified as follows:

"Q. Did Mr. Cowling, in the course of this conversation, agree that the property in these bank shares should be sold for $102 per share to be credited on his note? A. Yes, sir.

"Q. To whom was the sale of that stock made? A. It was made to me.

"Q. And that amount of money was paid into the assets of the bank? A. It was. . . .

"Q. How did you pay that money, in cash or draft? A. I am not certain, but I think I paid it by a draft on the Miami National Bank of Paola. I think half of it was draft, and it may have been all draft, or, possibly part was cash, I can't tell.

"Q. What was the value of that stock at that time? A. I don't know.

"Q. You considered it worth $5,100? A. I wanted it at $5,100 or I should not have paid that amount for it.

"Q. Do you recollect when that transaction was? A. It was in September, 1888.

"Q. About what time in September? A. Somewhere near the middle. . . .

"Q. To whose order was the draft made for the purchase-money? A. The Central Bank, I think. The money was paid—at least the bank received the proceeds of the sale of the stock.

"Q. How much was that draft? A. We paid $5,100 for the stock. I don't remember just in what manner we paid it, whether by draft or part by check. . . .

"Q. Did you casually meet Mr. Cowling on the street, or did you make an appointment with him? A. I made no appointment with him. I think I met him without appointment.

"Q. Did you buy other stock at that time? A. I was buying other stock at that time, yes, sir.

"Q. How many shares did you own at that time? A. About $11,000 worth.

"Q. The Central Bank has gone out of business? A. Yes, sir.

"Q. When did the bank go out of business? A. Last January.

"Q. What was the capital stock when it went out of business? A. One hundred thousand dollars.

"Q. How many shares of that stock do you own? A. One hundred and eleven, and a fraction, I think. . .

"Q. What was the dividend declared by the bank since you became a stockholder—the annual dividend? A. There never was but one dividend declared, and that was three per cent.

"Q. When was that? A. In the fall of 1888, about the time I became connected with the bank. . . .

"Q. Why did they declare that dividend of three per cent? A. I had nothing to do with that. That was before I was cashier. If I had been cashier it would not have been declared. .

"Q. How do you know it was declared? A. Because I received it on some shares I had. . . .

"Q. Was it after you bought the stock? A. Yes, sir.

"Q. How do you know it was after? A. Because I know I had the stock and had paid for it.

"Q. How is it that you can't fix the date previous to that in the other matters? A. Probably there was not as much money at stake as there is in this. A man will remember stock that he has $5,000 interest in."

There was no evidence whatever to contradict the proof that Thayer and Sponable bought and were the owners of this stock.

Thayer testified that this transaction was entered upon the books of the bank, and that it was known to the officers of the bank, but when required to name the officers of the bank who knew about it, he named Mr. Ridge, the president, F. T. Sponable, the bookkeeper, and himself, George E. Thayer, the cashier. Thayer's testimony upon that subject is as follows:

"Q. Was the transaction entered upon the books of the bank? A. It was.

"Q. State whether or not it was known to the officers of the bank? A. It was.

"Q. What officers of the bank knew of it? A. They all knew of it.

"Q. Name them? A. Mr. Ridge, F. T. Sponable and George E. Thayer."

Mr. Ridge was president of the respondent bank at the time and for some time afterwards. He resigned in the fall of 1891. If the evidence showed that Ridge knew of the transaction it might be that his knowledge was the bank's knowledge as he had no interest in permitting the fraud to stand. But Mr. Ridge, as the evidence shows, was not active in the management of the business and his testimony is clear and positive that he knew nothing of this transaction, as the following extract from his testimony will show:

"Q. Mr. Ridge, do you know anything about a

certain transaction with regard to replacing in the bank of $5,000 of stock, called the Cowling stock? A. No, sir.

"Q.  Never had anything to do with that transaction?  A.  No, sir.

"Q.  Was it not reported to you?  A.  No, sir.

"Q.  Did you ever approve of it?  A.  No, sir.

"Q.  Did you ever see anything on the books that indicated such a transaction had taken place?  A.  No, sir. . . .

"Q.  Who was in the active management of this bank while you were president?  A.  Mr. Hamilton was first and Mr. Thayer was subsequently.

"Q.  Cashier?  A.  Yes, sir.

"Q.  I understood you to say, so far as this transaction of replacing this Cowling stock in the bank in January, 1890, is concerned, you knew nothing about it?  A.  No, I did not know anything about it."

Thayer's testimony given in the McClintock case on that point is as follows:

"Q.  What were the assets of the bank at that time and of what did they consist?  A.  Notes, bills receivable and some stock.  I do not know whether they had any real estate at that time or not.

"Q.  Do you know what they would aggregate?  A. I do not remember now.

"Q.  What did the assets of the bank consist of at the time they went out of business?  A.  Real estate and bills receivable.

"Q.  Had they any money?  A.  Yes, sir.

"Q.  How much?  A.  We had money enough so that we paid our depositors one hundred cents on the dollar.

"Q.  How much was left?  A.  I think about $60,000.

"Q.  Cash?  A.  Yes, sir.

"Q.  Did that represent the earnings of the bank since September, 1888?  A.  No, sir.

"Q. What did it represent? A. It represented depositors' money in the bank.

"Q. Did it represent any portion of the earnings of the bank? A. No, I think not. I don't think the bank ever made any money.

"Q. Will you swear the bank didn't make any money during that time? A. No, I wouldn't swear to it; I only give my opinion.

"Q. Don't you know that it did? A. I know from the outcome it did not, because when they come to wind up they are way behind.

"Q. Why did they declare that dividend of three per cent? A. I had nothing to do with that. That was before I was cashier. If I had been cashier it would not have been declared."

The report of the referee leaving off the formal parts is as follows:

"1. On the issues made by the first count of the petition, and the answer, and reply, I find for the plaintiff, and find that the property described in the first count being owned by the Morleys as stated in the petition, they gave a deed of trust on the same January 28, 1886, to secure a note for $2,500, due five years after date, payable to Chas. F. Emery. On August 10, 1886, the Morleys gave a second deed of trust to said Emery to secure a note for $1,000 due three years after date. Up to this time, the plaintiff, Central Bank, had no interest in the property, but on September 8, 1890, while the bank was still in business, the Morleys, for value, gave a third deed of trust to secure to the Central Bank their note for $4,500. In December, 1891, the bank went into voluntary liquidation, and by action of its stockholders turned over to defendant for collection and proper distribution, all of its assets and effects, and committed to the defendant the duty of winding up its business, which duty was assumed and carried on by defendant until the appointment of A. R. Strother as receiver of the bank, on December 5, 1898.

On May 28, 1891, the Morley property was sold by the trustee named in the deed of trust of August 10, 1886, to secure the payment of $1,000, and at said sale the property was bought by the Central Bank, owner of the third deed of trust of $4,500, for the price of $1,125, and a deed was made to the said bank by the trustee for that consideration, subject to the first deed of trust for $2,500, dated January 28, 1886. . Defendant took possession of this Morley property as trustee of the bank, and as such trustee had charge and control of it. After the bank had gone into liquidation and defendant had undertaken the administration of its affairs, and about April or May, 1901, the defendant took up the Emery first deed of trust for $2,500, with interest, out of his own means. The exact amount paid by him is not shown, but assuming it was paid for at its face, the amount, principal and interest, paid by defendant April 1, 1891, was $2,624.25, so that from and after May 28, 1891, and until the property was condemned, taken and paid for by the city as hereinafter found, the property was owned by the Central Bank, was in charge and control of defendant as trustee of the Central Bank, and was held and managed by him in that capacity, while during the same time he was the owner and holder by purchase of the first deed of trust for $2,500, for which he had advanced the necessary funds to take it up in April, 1891. In March, 1892, the circuit court of St. Louis rendered a judgment for about $1,825 against the Central Bank, which judgment is called in the evidence the Hilliard judgment. In March, 1893, the execution was issued, directed to the sheriff of Jackson county, on this judgment, and by him levied on certain property (other than the Morley property) claimed by the execution creditor to belong to the Central Bank, and claimed by the defendant Thayer to belong to him or his wife. Defendant then arranged with R. H. Hamilton, counsel for the execution creditor, to pay up the judgment in full, to allow the execution sale

to proceed, to have the property bid in by Hamilton, to have it immediately quitclaimed to S. M. Thayer, defendant's wife. The property was bid in by Hamilton for $160, and he received a sheriff's deed therefor, quitclaimed as agreed, received payment of the execution in full, and gave an assignment, at defendant's request, of the Hilliard judgment to the Thayer Commission Company, a business corporation controlled by defendant. The execution was not satisfied. Defendant gave himself credit in his accounts with the bank for the amount paid by him in this transaction.

"On July 17, 1893, defendant caused an alias execution to be issued on the Hilliard judgment and levied on the Morley property, then owned by the Central Bank, subject to the $2,500 deed of trust then held by Thayer. On October 11, 1893, the sheriff sold the property under this alias writ, and defendant bid it in for $775 in the name of one Isaac Niles. In fact, Niles did not buy it, and so far as the evidence shows, knew nothing of the matter, but the attempt at purchase was by defendant for his own benefit. The sheriff's deed to Niles was made and delivered to defendant October 14, 1893. It was withheld from record for many years, and until January, 1899. On September 11, 1895, the city passed an ordinance for the condemnation of this Morley property, among other property, for park purposes. The condemnation verdict was rendered September 28, 1896, and was confirmed December 21, 1896, assessing the value of this property at $7,913. At this time and for some time prior, the Emery note and deed of trust for $2,500, which, as stated, had been taken up by the defendant about April, 1891, was held by the First National Bank of Kansas City as collateral to indebtedness to the bank owing by defendant Thayer and the Thayer Commission Company on their joint obligations. A few days after the confirmation of the verdict assessing this property at the value stated and on December 26, 1896, defendant had the trustee sell it again

under the first deed of trust, then held by the bank as collateral, and at the sale defendant bid it in in the name of E. F. Swinney, the bank's cashier, for $3,500.

"On July 20, 1898, the city paid Mr. Swinney $7,-913 for the property, in accordance with the verdict and judgment, and the money was applied to the use of the defendant in satisfaction of his individual debts to the bank.

"I find that from the date of the sale made to the Central Bank in May, 1891, under the Emery second deed of trust for $1,000 until the payment to the First National Bank of $7,913 in consummation of the judgment of condemnation, the Morley property belonged to the Central Bank; that during that time defendant, as trustee of the bank, was in possession and control of the property; that in taking up the Hilliard judgment he simply, as trustee, advanced the necessary funds to pay it, as he himself regarded it by charging to the bank the amount paid; that in having that judgment in form assigned and under alias execution causing the property to be sold and buying it in the name of Niles, he attempted to deprive his principal of the beneficial ownership of the property; that he attempted the same thing when, after the condemnation verdict had been confirmed, valuing this property at $7,913 and virtually disposing of it to the city for that amount, he caused the sale to be made under the first deed of trust; and that as far as the bank, or the plaintiff receiver, is concerned, these maneuvers were futile and void, and the sum of $7,913 received by Swinney, and applied as stated, was the money of the bank. The defendant should have credit for the amount of his advances with six per cent to the date of the receipt of the condemnation money, and should be charged with the balance with interest at six per cent from that date to the date of filing this report.

"I, therefore, find and state the account on the issues made on the first count of the petition as follows:

Bank v. Thayer.

Defendant is charged, July 21, 1898....... $7,913.00
    Defendant is credited, July 21, 1898:
By $2,624.25, with 6 per cent inter-
    est from April 1, 1891 ...... $3,775.55
By amount paid repairs........... 56.15
By amount paid insurance ...... 150.60
By amount paid counsel and witness
    fees in condemnation case .... 277.08
By amount paid title certificate ... 55.00
By amount paid paving tax ....... 98.20
By amount paid general taxes .... 221.14
                        $4,633.72     4,633.72

Balance due July 21, 1898 ........            3,279.28
To interest from July 21, 1898, to
    February 25, 1901 .........            510.43
Total .................. .......       $3,789.71

"2. I find the issues on the second count of the petition for the plaintiff. Inasmuch as I have already found that the Morley property continued to be the property of the Central Bank after the making of the sheriff's deed to Niles October 14, 1893, and until the payment by the city of its assessed value on July 20, 1898, it follows that the rents collected by defendant from the date of the sheriff's deed to Niles to August 1, 1898, belonged to the bank and not to the defendant. He collected and used during this time the sum of $2,-100. He did not charge himself with these rents, because he assumed that the property was his and, therefore, that its income was his. I hold that the rents mentioned must be accounted for to plaintiff. I, therefore, find that plaintiff is entitled to recover on the second count the sum of $2,100, with interest at six per cent per annum from December 1, 1898, to the date to which the defendant's account was balanced on the books of the bank before their delivery to the receiver.

"3. I find the issues on the third count of the petition for the defendant. This count seeks to recover the sum of $1,800 with interest for which defendant took credit on account of vault and office rent at the rate of $20 per month, from June 1, 1891, to December 1, 1898. This credit was actually entered on the books of the bank after the demand of plaintiff receiver for the assets and books to be delivered to him. It is also pointed out and is a fact that the Thayer Commission Company, to which the rental is alleged to have been paid, was virtually the defendant, so that the defendant was virtually by this credit reimbursing himself for $20 of the amount expended for rent, during the time mentioned. While this is true, it does not seem to me that the justice or injustice or the reasonableness of the credit depends at all upon the circumstance that defendant, under the name of the Thayer Commission Company, took credit for this rental. I find that during that period he had provided and paid for quarters for the storing of the books and papers, and for the transaction of the business of winding up the affairs of the bank, and that the quantum of rent which he assessed in his account against the bank and gave himself credit for is just and reasonable.

"4. The fourth count of the petition seeks to recover the sum of $2,975 for which the defendant has charged the bank as salary for looking after its affairs after July 1, 1891. I do not hesitate to hold and find that if the compensation claimed related to the defendant's pay for services in the matter of the Morley property or in relation to the Cowling stock transaction, involved in subsequent counts of the petition, then he should not be allowed any pay, and should be held to have forfeited his right to any; but it must be remembered that the duties devolved upon and discharged by defendant in winding up the affairs of the bank were various and extensive; that he collected a large amount of the assets, and except in some of the instances chal-

lenged in the petition, rendered valuable services to the bank, when others of its officers had ceased to pay any attention to its business. It is true that the other officers committed the winding up of the affairs of the bank to him, and it is also true that, except in the instances of misconduct on his part found in this report, he rendered valuable and beneficial services to the bank. The justice should be equal and exact; the bank should not obtain the benefit of valuable services without paying for it; the case is not like one of several where the agent and trustee has been guilty of such malfeasance as to forfeit all pay for his services in the one or more cases. The claim for salary relates to the entire administration of the bank's assets, and except in the instances found, it was efficient and beneficial so far as the evidence discloses. Courts of chancery in such matters have sought to be just, but never vindictive. They have exacted and will continue to exact, forfeiture of compensation in any transaction in which the trustee or agent has dealt in bad faith with his principal, and especially where the principal has been compelled to resort to the court to obtain his just rights. But in this case and because of the individual instances in which defendant has been guilty of misconduct, it would be extending the rule beyond my conception of its proper application to hold that for his services generally during a period of seven or eight years, he should be allowed nothing. The amount for which he takes credit is, under all circumstances reasonable and fair, and I find the issues on the fourth count of the petition for the defendant. The finding of the defendant's counterclaim set up in the answer to this fourth count of the petition will be for the plaintiff and against defendant.

"5. The fifth and sixth counts may be considered together. In September, 1888, one Cowling was heavily indebted to plaintiff bank and was the owner of fifty shares of its capital stock, evidenced by two certificates for twenty-five shares each. On September 24, 1888,

defendant bought this stock of Cowling at $102 per
share, paying the purchase price to the bank, by Cow-
ling's direction, and the same was applied on Cowling's
indebtedness.  About that time or afterward, twenty-
five shares of this stock were transferred to J. W. Spon-
able.  Defendant and Sponable held the stock for over a
year and collected at least one dividend on it.  On Jan-
uary 31, 1890, while defendant was cashier, the amount
of $5,100, which defendant had originally paid for the
stock, was, by his direction, abstracted from the funds
of the bank and divided between defendant and Spon-
able.  This was done by passing $2,550 to the individual
credit of each of them, and these amounts were subse-
quently drawn out by defendant and Sponable.  It is
contended on the part of defendant, in substance, that
the $5,100 was advanced by him originally in the nature
of a loan to the bank for the purpose of taking up the
Cowling stock, and under an arrangement with the bank
that the money was to be returned on demand.  The
evidence does not sustain this contention.  The whole
transaction of abstracting this money was a fraud on the
rights of the bank and was unknown and unapproved
by any of its stockholders and officers, except the par-
ties interested, and the bookkeeper, who, at defendant's
direction, passed the funds to the credit of defendant
and Sponable, as stated.

"On the fifth count of the petition, I find the issues
for the plaintiff and that the plaintiff is entitled to re-
cover thereon $2,550 with interest at six per cent per
annum from January 31, 1890, to date.  On the sixth
count of the petition, I find the issues for the plaintiff,
and that he is entitled to recover on said count the sum
of $2,550 with interest at six per cent per annum from
January 31, 1890, to date.

"6.  On the issues made by the seventh count of
the petition and the answer and reply, I find for the de-
fendant.  The matters involved in the other counts of
the petition, except the third and fourth counts, are not

embraced in the items of debit and credit on defendant's account as kept on the books of the bank and showing his receipts and disbursements. The items of office rent and salary involved in the third and fourth counts of the petition do appear as credits to defendant in that account, and properly so. The other items of charge and credit in that account are not disputed. That account, including the disputed items of office rent and salary, shows a balance in defendant's favor of $2,560.96, for which, according to my findings, he should receive credit as against the total of the amounts found against him under the other counts of the petition.

"I therefore, on this general account, find in favor of defendant in the sum of $2,560.96, with interest from December 1, 1898, at the rate or six per cent per annum to date.

"7. Hence, on all the issues made by the pleadings, I find that the defendant should be charged and credited as follows:

| | |
|---|---|
| To amount due plaintiff on first count . . . .$ | 3,789.71 |
| To amount due plaintiff on second count . . | 2,381.75 |
| To amount due plaintiff on fifth count . . . . | 4,243.00 |
| To amount due plaintiff on sixth count . . . | 4,243.00 |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ | 14,657.46 |
| By amount due defendant on seventh count . . | 2,904.53 |
| To balance . . . . . . . . . . . . . . . . . . . . . . . . .$ | 11,752.93 |

"I find for plaintiff in the total sum of $11,752.93 as the amount which he is entitled to recover from defendant this twenty-fifth day of February, 1901, and recommend judgment therefor."

Defendant in due time filed exceptions to the report of the referee which were overruled, and he excepted.

Thereupon the court rendered judgment for plaintiffs for $11,752.93.

Thereafter defendant filed his motion for a new trial, which being overruled, he saved his exceptions, and brings the case to this court by appeal for review.

Defendant's first insistence is that a corporation has authority of law to buy its own stock, but we do not understand that any such question is involved in this controversy. Plaintiff's position is that the bank did not undertake to buy any of its own stock, but that its cashier, the defendant, abstracted from its treasury five thousand one hundred dollars under a pretended sale of fifty shares of its capital, attempted to be made by himself as an individual to himself as cashier. The issue made by the pleadings and tried below was whether defendant had abstracted five thousand one hundred dollars from the bank's treasury under the pretended sale of stock, or whether he had taken that five thousand one hundred dollars from the bank's treasury in repayment of money advanced or loaned by him and Sponable to the bank; and the referee found the issue for plaintiffs.

It is argued by defendant, however, that there was no evidence to support the finding of the referee that defendant abstracted the sum of five thousand one hundred dollars from the funds of the bank without the knowledge of the managing officers of the bank; that the president of the bank was the only managing officer who denied knowledge of this transaction, and this in the face of his sworn statements made to the Secretary of State in which this stock is shown as an asset of the bank.

It is true that Fred. T. Sponable, one of the directors who examined the statements of the bank, made in September, 1890, knew of the transaction when it was made, and made the entries of the same upon the books of the bank at the time the transaction occurred. And Thomas S. Ridge, F. T. Sponable and L. G. A. Copely, directors of the bank, attested the sworn statement made, but Ridge testified that he rarely ever examined them, did not make them up, but that that was

done by the clerks and he knew nothing about the transactions under consideration. This stock was bought by defendant in September, 1888, before he was elected cashier of the bank, and before he had any intimate knowledge of its affairs, and when he was expecting to be made cashier, he paying therefor one hundred and two dollars per share.

About that time or shortly afterwards, twenty-five shares of this stock were transferred to J. W. Sponable and he and defendant held the stock for over a year and collected at least one dividend on it. Soon thereafter Thayer was elected cashier and entered upon his duties as such and was practically in full control of the assets of the bank. He and Sponable held this stock a year and four months without any further dividends being declared or paid thereon. During this time defendant became thoroughly familiar with the business of the bank, and its financial condition, saw that it was not making but losing money, that he had paid too much for this stock, which was about to be sold as the property of Cowling, and under these conditions some five days before the day fixed for the sheriff's sale, defendant of his own volition without consulting anybody caused the money which he had paid for the stock to be returned to him and Sponable.

It is true that F. T. Sponable was at the time of the transaction in question a director and one of the bookkeepers in the bank, and made the entries necessary to place the five thousand one hundred dollars, one-half to the credit of Thayer, and the other half to the credit of J. W. Sponable, his father. He testified in effect that he knew but little about the transaction except that the stock was turned back to the bank and the money placed to the credit of his father and Thayer, by the direction of Thayer. There is of course no question but that these two officers of the bank knew all about these entries. It is said that Ridge also must have known of these entries, because he was president of the bank

and signed the statement made by the bank in regard to its financial condition, and under these facts the bank must be held to have known of the transaction and acquiesced therein.

But Ridge testified that he knew nothing about the matter and nothing about what was included in said report. F. T. Sponable was the son of J. W. Sponable, who claimed one-half of the stock in question, while Thayer owned the balance. F. T. Sponable was, therefore, indirectly, and Thayer directly, interested in the transaction, and while having full knowledge of the transaction they never, it seems, imparted to other officers or stockholders any information in regard to it. Under these circumstances their knowledge should not be held knowledge of the bank.

The defendant's next contention is, that the transaction having occurred more than five years before the institution of any suit, the action is barred by the statute of limitations; because the transaction was open, visible and unconcealed, and was put upon the books of the bank at the time the transaction occurred, and the books were open to the inspection of the officers and stockholders of the bank. As a general rule the statute of limitations begins to run in favor of a person who commits a fraud as soon as committed, unless it be concealed from the plaintiff or party complaining, or which is of such a character as necessarily implies concealment. The defendant while acting in the capacity of director and cashier for the bank was an implied trustee or agent for it. [Landis v. Saxton, 105 Mo. 486; Kane v. Bloodgocd, 7 John. Ch. 90; Williams v. Halliard, 38 N. J. Eq. 373; Cooper v. Hill, 94 Fed. 586; Hayden v. Thompson, 36 U. S. App. 361, 71 Fed. 60; Briggs v. Spaulding, 141 U. S. 132; Spering's Appeal, 71 Pa. St. 11; Wallace v. Bank, 89 Tenn. 630; Hughes v. Brown, 88 Tenn. 578; Allen v. Curtis, 26 Conn. 456; Ryan v. Railroad, 21 Kan. 365; Commissioners v. Reynold, 44 Ind. 509; Company v. Gibb, L. R. 5 H. L. 480.] And

it has uniformly been held in this State that the statute of limitations runs against implied trusts. [Smith v. Ricords, 52 Mo. 581; Ricords v. Watkins, 56 Mo. 553; Buren v. Buren, 79 Mo. 542; Bent v. Priest, 86 Mo. 486; Landis v. Saxton, 105 Mo. 486; Loomis v. Railroad, 165 Mo. 469; Callan v. Callan, 175 Mo. 360.] Nor is there any question but that the officers of a corporation may interpose the statute of limitations as a defense when sued by it to compel them to account for assets of the corporation wrongfully and fraudulently appropriated by them. [Landis v. Saxton, supra.]

But if the defendant was guilty of fraud in concealing this transaction so that the bank did not discover it until the receiver was appointed, a different rule prevails, and he can not avail himself of the statute of limitation, unless the plaintiff corporation was in possession of or had notice of the main facts constituting the fraud.

The burden of proof was upon the plaintiff to establish the exception to the general rule and to establish the fraud. [Shelby County v. Bragg, 135 Mo. 291; Callan v. Callan, supra.]

No officers of the bank other than those named had any notice whatever of the transaction in question, except what is shown upon the books of the bank. Thayer never said a word to any of them about it, and Ridge, who was president of the bank at the time, testified that he had nothing to do with it, and knew nothing about it. It is true that Thayer testified that all the officers of the bank knew about it, but when asked to name them he answered, Mr. Ridge, F. T. Sponable and George E. Thayer. With respect to this matter the referee found that "the whole transaction of abstracting this money was a fraud on the rights of the bank and was unknown and unapproved by any of its stockholders and officers, except the parties interested and the bookkeeper, who at defendant's direction passed the funds to the credit of defendant and Sponable as stated." This finding is

supported by substantial evidence, and this being a law case the conclusions of the referee, and the confirmation thereof by the circuit court stand in the nature of special findings and supported by substantial evidence will not be reviewed on appeal. [Franz v. Dietrick, 49 Mo. 95; Berthold v. O'Hara, 121 Mo. 88; Dempsey v. Schawacker, 140 Mo. 680.]

We come now to the question of concealment of the fraud by defendant.

The entries which were made upon the books of the bank, even if they had been seen by the other officers, would not have disclosed to them the fact that Thayer was selling this stock to the bank. The entries which Thayer caused young Sponable, the bookkeeper, to make upon the books of the bank are as follows:

First. On the general journal of the bank at page 296, there is the following entry:

"January 31, 1890-Stocks and Bonds, 50 shares of stock, P. C. Cowling, $5,100."

Second. On the general ledger of the bank at page 209, under head of "Stocks and Bonds," are the following (the first of which entries is also here given so as to explain the latter one, which alone has any reference to this transaction):

"STOCKS AND BONDS.

"May 3, 1889, 10 shares Cen. Bank Stock, 　　$ 840."
"January 31, 1890, "50"
　　P. C. Cowling, 　　　　　　　　　　5,100."

Third. In a book known as the "general ledger and balance book No. 3," which book shows the individual accounts between the bank and its depositors, are found the following entries:

In the individual account of George E. Thayer, under date of January 31, 1890, Thayer is credited with $2,550. There is nothing in this entry to show why the credit was given. It is the same entry that would have

been made if Thayer had deposited that day in the bank the sum of $2,550.

In the individual account between the bank and J. W. Sponable, under date of January 31, 1890, Sponable's account is given credit for $2,550. There is nothing in this entry to show why the credit was given, but the entry is of the same character as would have been made if Sponable had that day brought in $2,550 and deposited it in the bank.

There is nothing upon the books or records of the bank which of themselves would show the facts of the fraud complained of, viz., that Thayer had himself individually sold to himself as cashier this fifty shares of stock, and had taken the money out of the bank and put half of it to his credit, and the other half of it to Sponable's credit. In fact, when the receiver coupled these entries up with other things and charged Thayer with making this pretended fraudulent sale, Thayer denied it, and stated, as alleged in his answer, that it was not a sale of the stock; that he and Sponable had never owned the stock; that they had merely loaned to the bank $5,100 and taken this Cowling stock as collateral security; and that the entries upon the books of the bank merely meant that he had demanded and received the return of the money which he and Sponable had loaned the bank, and had returned the collateral which they held as security therefor.

We may ask what more could defendant have done in order to have concealed this fraudulent transaction from the other officers of the bank other than Sponable, the bookkeeper, who did as directed by him, and who, it does not appear, ever said anything to the officers of the bank about it, than he did do, unless it would have been an omission from the books entirely of any entry in respect to the matter? He was the confidential agent of the bank and in full control of all its assets at the time of his perpetration of the fraud, and until Strother was

appointed receiver on December 5, 1898, and when these facts and circumstances are considered in connection with the acts and conduct of the defendant in the management of the bank's affairs, and circumstances disclosed by the record to which we have before adverted, he was guilty of such acts and conduct not only from which concealment may well be implied, but showed concealment by him in fact of the facts and circumstances with respect to the transaction. The entry upon the books of the bank are made in such a way that they could but have deceived and misled an ordinarily intelligent and experienced banker, and while the books of the bank are at least prima facie evidence of knowledge on the part of the bank and its officers, that evidence is clearly overcome by the evidence and facts disclosed by the record, which to our minds shows a preconcerted scheme on the part of defendant to practice the fraud in question and keep it concealed from the bank.

It is said for defendant that the court erred in refusing to permit Thayer to testify under what arrangements he purchased the stock in question in 1888, because the plaintiff had introduced his testimony taken in another case covering the very transaction in question, and having introduced that testimony waived the right to object to Thayer's testifying on the ground that Hamilton, the cashier, was dead.

The authorities relied upon by defendant in support of his position are: Tomlinson v. Ellison, 104 Mo. 105; Ess v. Griffith, 139 Mo. 322; In re Estate of Soulard, 141 Mo. 642; Borgess Inv. Co. v. Vette, 142 Mo. 560. But they do not do so, for in all those cases the questions were whether or not a party by taking the deposition of a witness otherwise incompetent under the statute waived his right to object to the incompetency by taking and filing the deposition of such witness. The question before us is whether or not a party to a suit can testify as to any contract or arrangement that he may have made with the opposite party who is dead,

or, if the opposite party be a corporation, as in this case, whether he can testify as to any arrangement or contract that he claims to have made with an agent or officer of such corporation who is dead at the time of the trial. This question was before the court in the case of Williams v. Edwards, 94 Mo. 447, and it is there held that one who contracts with the authorized agent of a corporation is not a competent witness as to such contract, or the admission and declarations of the agent after the latter's death. [McCormick Harvesting Machine Co. v. Heath, 65 Mo. App. 461; Nelson v. Railroad, 66 Mo. App. 647.]

Nor was there error in excluding the deposition of P. C. Cowling which was offered by defendant, and for several reasons. In the first place the deposition was taken in another case where the parties were not the same as in this, nor were the issues the same.

In the second place the deposition was not filed in this case and no notice ever given by the defendant that he desired or expected to read said deposition. [Leslie v. Rich Hill Coal Mining Co., 110 Mo. 31; Borders v. Barber, 81 Mo. 636.]

Our conclusion is that the judgment is for the right party and should be affirmed. It is so ordered.

All concur.