SEMPLE, Respondent, v. SCHWARZ et al.,
Appellants.

St. Louis Court of Appeals, March 3, 1908.

1. BUILDING RESTRICTIONS: Recording Deed: Constructive Notice. Where a deed is duly acknowledged and recorded in the recorder's office, it imports notice of its contents to a subsequent purchaser of the property conveyed, including notice of covenants relating to building restrictions.

2. ————: Evidence. In an action to enjoin the violation of building restrictions contained in all conveyances made by the owner of a certain addition to the city of St. Louis, evidence that different restrictions were imposed in conveyances of lots in another addition adjoining, laid off and conveyed by the same grantor, was inadmissible.

3. ————: "Trade or Business:" Physician. A building restriction contained in a deed conveying a certain lot which provided that the lot should not be "used or occupied for trade or business of any kind whatever," was violated by a physician who built a house on the lot, set apart a room as an office for receiving patients, provided certain hours of each day in which they should call upon him and displayed his professional card upon

130 App—5

the door; such use of the premises was conducting a "business" in the broad sense of the term and could be enjoined.

But such physician should not be prohibited from advertising his residence in the telephone book, nor from receiving patients there when they should come to see him, nor from setting apart a room in which to receive patients. The restriction would only prevent him from maintaining an office and from advertising in any manner that he would receive patients there.

Appeal from St. Louis City Circuit Court.—*Hon. Horatio D. Wood,* Judge.

DECREE FOR PLAINTIFF IN COURT OF APPEALS.

*T. K. Skinker* for appellant.

(1) The defendants are not using the premises in such manner as to violate the alleged restriction. The work of a physician is not business within the meaning of the restriction. Ex parte Breull, L. R., 16 Ch. Div. 484; Dent v. West Virginia, 129 U. S. 121; State v. Dent, 25 W. Va. 1; State v. Gregory, 83 Mo. 133; State v. Medical Board, 32 Minn. 324; State v. Knowles, 90 Md. 658; People v. Phippin, 70 Mich. 20; Singer v. State, 72 Md. 464; Orr v. Meek, 111 Ind. 40; Eastman v. State, 199 Ind. 280; State v. Carey, 4 Wash. 424; State v. Creditor, 44 Kan. 565. (2) The alleged restrictions have been abandoned by Fullerton, with the acquiescence of the plaintiffs. Levy v. Schreyer, 177 N. Y. 293, 50 N. Y. Supp. 584; Skillman v. Smatheurst, 57 N. J. Eq. 1; Rolls v. Miller, L. R., 27 Ch. Div. 71; Hobson v. Tulloch, L. J., 67 Ch. 205; Jenks v. Pawlowski, 98 Mich. 110; Coughlin v. Barker, 46 Mo. App. 75.

*Seddon & Holland* for respondent.

(1) Defendants (appellants) are using their property in a manner to violate the restrictions imposed by Fullerton on said property as the servient estate for the benefit of the property of the plaintiff, the dominant

estate.    Hall v. Wesster, 7 Mo. App. 62; Godard v.
Chaffee, 2 Allen 395; Hachney v. Levy, 12 Ore. 44;
Hardware Co. v. Mfg. Co., 86 Tex. 153; Kemp v. Sober,
20 L. J. Ch. 602; Doe v. Kieling, 1 Mo. S. 95; Rolls v.
Miller, 27 Ch. D. 75; In re Law Reporting, 58 L. J.,
Q. B. 90; Ragsdale v. Nagel, 106 Cal. 332.   (2)   The
defendants (appellants) had notice both actual and
constructive of the restrictions when they purchased
their property.    Drey v. Doyle, 99 Mo. 459; Major v.
Barney, 49 Mo. 458; Roan v. Winn, 93 Mo. 503; 21
Am. and Eng. Ency. of Law, p. 584; Johnson v.
Thweats, 18 Ala. 747; Hagerman v. Sutton, 91 Mo.
520; Loring v. Groomer, 110 Mo. 640; Digman v. Mc-
Callum, 47 Mo. 872; Stevens v. Hawpton, 47 Mo. 406;
People v. DeCamp, 12 Hun 378; Saril v. Payne, 24 N.
Y. St. 486; Vincent v. People, 5 Park Cr. 101; Alexan-
der v. Houghton, 86 Tex. 702; Angier v. Schiefflin, 72
Pa. S. 106; 2 Best on Ev., sec. 347.

STATEMENT.—Joseph Scott Fullerton, now de-
ceased, in his lifetime, owned a tract of land, in the
city of St. Louis, stretching from Boyle to Taylor ave-
nue for about 2,090 feet, bounded on the north by a
line parallel with Olive street and distant therefrom
155 feet; on the south by McPherson avenue; on the
east by Boyle avenue and on the west by Taylor avenue.
The strip is bisected in nearly equal parts by Newstead
avenue, sixty feet wide, running north and south.   Ful-
lerton laid off said tract and platted the same as a
subdivision of the city of St. Louis, which platted sub-
division was duly executed by him, on September 21,
1891, and was recorded in the office of the recorder of
deeds of said city.    In laying off said subdivision Ful-
lerton laid off a street and two alleys running east and
west through said tract and parallel with Olive street.
The street was designated on the plat of the subdi-
vision as "Fullerton's Westminster Place."    The street
is seventy feet wide, the north line being 314 feet from

Olive street. The alleys are fifteen feet wide. The south line of the alley north of the street is 154 feet from the street, and the north line of the alley south of the street is 145 feet from the street. In laying out said subdivision, Fullerton subdivided so much of said land as fronted north and south on "Fullerton's Westminster Place" and as laid between said street and said alleys into building lots. The lots as laid out and platted run north and south between parallel lines and front on "Fullerton's Westminster Place;" they run back to the alley and are sixty feet wide, except the corner lots which are eighty feet wide. So much of the tract as lies between the south line of the south alley and McPherson avenue, Fullerton did not divide into building lots until the year 1896, when he subdivided it into lots, fronting them on McPherson avenue, and designated the subdivision as "Fullerton's Second Westminster Addition, in city block 4580S, 4581S." To make the property in Fullerton's first subdivision fronting on "Fullerton's Westminster Place," a first-class high-priced, exclusive residence place, Fullerton spent large sums of money in grading, shaping and otherwise improving the property and imposed on each lot fronting on said "Fullerton's Westminster Place" uniform easements, covenants and restrictions as to the mode, manner and purpose of using said lots, which restrictions were to continue for the period of twenty-five years, and adopted a form of deed for the conveyance of each of said lots, containing said uniform easements, restrictions, etc. With few exceptions all of the lots in said subdivision have been sold by Fullerton, or his testamentary trustee, and the purchasers have improved them by the erection thereon of expensive and sightly residences. The covenants and restriction contained in the uniform deed adopted and used by Fullerton in his lifetime, and by his testamen-

tary trustee since his death, that are purtenant to the issues in this case are as follows:

"But one building shall be erected or placed upon said lot, and such buildings shall never be used or occupied for any purpose except for that of private residence exclusively; nor shall any part or portion thereof ever be used or occupied except solely as a residence; nor shall any such building be arranged or ever used or occupied as flats; nor shall said lot or any part thereof ever be used or occupied for trade or business of any kind whatever."

On or about April 1, 1893, Fullerton sold to William G. Boyd lot No. 18, upon the plat of "Fullerton's Westminster Place Addition," fronting eighty feet on the north line of Fullerton's Westminster Place and running back to the alley, and conveyed the same to Boyd by a deed containing the covenants and restrictions above set out. This deed was duly recorded in the recorder's office of the city of St. Louis on April 1, 1893. The deed recites that said Boyd accepted it subject to the aforesaid easements and restrictions, and covenanted therein with said Fullerton, his successors and assigns, that he, his heirs and assigns, should forever faithfully observe and perform said several restrictions and conditions, and each of them, and if he (the said Boyd), or any person claiming under him, should at any time violate or attempt to violate, or should omit to perform or to observe any of the foregoing restrictions and condition, it should be lawful for any person owning a lot in "Fullerton's Westminster Place Addition" which should be subject to the same restrictions or conditions in respect to which default should be made, to institute and prosecute appropriate proceedings in law and equity for the wrong done or attempted, and the said Fullerton covenanted with the said Boyd, his heirs and assigns, that he, the grantor, would not at any time thereafter convey or otherwise

dispose of any lot in "Fullerton's Westminster Place Addition" except upon and subject to such restrictions and conditions as hereinbefore mentioned, and such as were common to all the lots in said subdivision. Boyd did not build on the lot but, on the fourteenth day of August, 1901, for a consideration of $13,000, conveyed the same to defendant J. Laura Schwarz by general warranty deed. (No mention of any restrictions is made in this deed.) J. Laura Schwarz and her husband, Henry Schwarz, acting together, had a dwelling erected on the lot at a cost of $26,000. Defendant Henry Schwarz is a practicing physician and a lecturer in the medical department of Washington University. His practice is confined principally to obstetrics and the diseases of women. Both defendants approved the plan of the house. The lot is a corner lot and the house fronts on "Fullerton's Westminster Place," and the main or family entrance is from this street. There is also a side entrance on Newstead avenue to a room of the residence that was planned and set apart by defendants as a reception room for all persons who might call at the residence to consult Dr. Schwarz professionally, and on the street door of this room is tacked a card or doorplate with the name "Dr. Schwarz" thereon; and at the curb immediately in front of the entrance to this room is a carriage step with Dr. Schwarz's name cut on it. Plaintiff acquired lot No. 2, in the subdivision fronting on "Fullerton's Westminster Place" (the second lot west of Newstead avenue), and in 1892 erected an expensive dwelling thereon which she has ever since and now occupies as a residence. The suit is to enjoin defendants from maintaining and using any part of their residence for the reception and treatment of patients by Dr. Schwarz. The petition alleges that defendants are violating the covenants in the Boyd deed by the use of their residence as a doctor's office and by the reception and treatment

of patients therein. The answer denies that the use which defendants are making of their property violates said restrictions, and pleads in estoppel sundry violations of the restrictions and covenants, in which violations it is alleged plaintiff and all other owners of lots in said subdivision have long acquiesced. The judgment of the circuit court was that defendants be enjoined from using any part of their dwelling for the purpose of receiving and treating sick people therein; from this judgment defendants appealed. Dr. Schwarz was introduced as a witness by plaintiff. He testified that he was a lecturer on obstetrics in the medical department of Washington University; that he kept a free clinic for women from eleven o'clock a. m. to twelve M., Mondays, Wednesdays and Fridays, on Locust street, and that his surgical operations were performed at St. Andrew's Hospital and St. Luke's Hospital; that he had no office; that he had been in practice in St. Louis for twenty years and was called to see patients at all hours of the day and night; that in his twenty years' experience as a physician he had found it impossible to prevent patients calling to see him at his home at all hours when it was expected he could be found there, and that his experience in this respect was not different from that of other physicians in the city of St. Louis, having an extensive practice; that the privacy and peace of his family were disturbed before moving into his present residence by the frequent calls of patients to see him, and for the purpose of securing the privacy and peace of his family, he and his wife planned the room fronting on Newstead avenue as a reception room for such patients as would call at the residence; that he saw patients in this room from two to four o'clock p. m. of each week day and gave his patients to understand that he could be seen there during these hours, and an average of about five persons per day called and were received in this room; that

he performed no operations at his residence but simply diagnosed a case and if an operation was necessary made an appointment with the patient to perform it at one of the hospitals.

Charles C. Nichols, Stephen F. Quinette, Eugene Hyke and Robert Rutledge, all experienced real estate brokers in the city of St. Louis and acquainted with "Fullerton's Westminster Place," testified that in their opinion the use Dr. Schwarz was making of his residence substantially lowered the value of plaintiff's property. James M. Carpenter, Adam Boeck and John R. Laughlin, experienced real estate men in St. Louis and acquainted with "Fullerton's Westminster Place," testified they did not think the use Dr. Schwarz was making of his residence depreciated the value of plaintiff's property in the least.

For defendants the evidence tends to show that it is practically impossible for any physician in the city of St. Louis, having a large practice, to prevent his patients from calling at his home for the purpose of consulting him. Both defendants testified they had no actual notice of the restrictions and covenants imposed upon the property and did not learn there were any until after they had commenced the erection of their house.

BLAND, P. J. (after stating the facts).—1. The deed of Mrs. Schwarz's immediate grantor was duly acknowledged and recorded in the recorder's office in the city of St. Louis at the time she and her husband bought the lot in question. This deed imported notice of its contents to them and all other persons (R. S. 1899, sec. 924), therefore, defendants must be deemed to have purchased the lot with notice of the covenants and restrictions. [Geer v. Lumber and Mining Co., 134 Mo. 84.]

2. The deeds of Fullerton and all those of his tes-

tamentary trustee, to lots fronting on McPherson avenue and platted in Fullerton's Second Westminster Place Addition, contain covenants and restrictions materially different from those contained in their deeds conveying lots in the first addition. Permission is granted in deeds to lots in the second addition to erect apartment houses on the lots, and the evidence shows that a large apartment house has been erected on the corner of Newstead and McPherson avenues and that four or five different families live in this house; that next door west of the apartment house is Miss Crump's boarding house at which from twenty to twenty-five boarders take their meals daily. Defendants contend that the property fronting on McPherson avenue was included in the first plat under the head of "Fullerton's Westminster Place." All evidence in respect to Fullerton's Second Addition was excluded by the court, and we think properly, for the reason the lots in the Second Addition were not laid off until long after those in the first were laid off and platted, and the fact that Fullerton called one the first and the other the Second Addition shows conclusively that they were regarded by him as separate and distinct additions to the city of St. Louis.

3. Defendants insist that the evidence fails to show Dr. Schwarz is carrying on any business at his residence on lot No. 18 that what he does there is in the exercise of his calling as a physician and is professional work, not a business calling or vocation within the meaning of the restrictions. Webster defines business as follows: "1. That which busies one, or that which engages the time, attention, or labor of any one, as his principal concern or interest, whether for a longer or shorter time; constant employment, regular occupation; as, the business of life. (2) Any particular occupation or employment engaged in for livelihood or gain, as agriculture, trade, art, or a profession." This defini-

tion is approvingly cited in the case of Trustees of Columbia College v. Lynch, 46 How. Pr. 275. In Beickler v. Guenther, 96 N. W. (Ia.) 896, it is said: "To 'engage in business' is uniformly construed as signifying to follow that employment or occupation which occupies the time, attention, and labor for the purpose of a livelihood or profit." In Ragsdale v. Nagle, 106 Cal. 332, it was contended that abstracting was not a business but a profession or trade. The court held that it was a business. In Hacheny & Beno v. Leary, 12 Ore. 40, it was held that taking an application for insurance and transmitting it to the company was doing business. In Rolls v. Miller, 27 Ch. D. 71, the lease of a house contained a covenant that the lessee should not use, exercise, or carry on upon the premises any trade or business of any description whatsoever; it was held (affirming the decision of PEARSON, J., "that a charitable institution called a 'Home for Working Girls,' where the inmates were provided with board and lodging, whether any payment was taken or not, was a business, and came within the restrictions of the covenant." The Incorporated Council of Law Reporting for England and Wales was incorporated for the purpose of reporting the decisions of the superior courts of law and equity. It was held that it was incorporated to do business, in The matter of the Duty on the Estate of the Incorporated Council of Law Reporting, 58 Law Jr. (1889) 90. In Kemp v. Sober, 20 Law Jr. (1850) 602, in the conveyance of a house at Kemp Town, Brighton, a covenant was contained that the purchaser should not carry on any trade, business, or calling in the said house, or permit the same to be used to the annoyance, nuisance, or injury of any of the houses in Kemp Town; "Held, that keeping a girls' school was a breach of the covenant; and that the court would interfere by injunction, notwithstanding other schools had been per-

mitted to be carried on upon the same property in houses which were subject to a similar covenant."

Under the Massachusetts exemption laws it was held, in Goddard v. Chaffee, 2 All. 395, that the violin and bow of a debtor, whose business is that of a musician, were exempt from attachment, and in the course of the opinion it is said: "Business is a word of large signification, and denotes the employment or occupation in which a person is engaged to procure a living," quoted in the case of Hardware Co. v. Manufacturing Co., 86 Tex. 153. See also Abel v. State, 90 Ala. 1. c. 633. In Netterville v. Barber, 52 Miss. 1. c. 171, it is said: "The primary signification of the word (business) is employment—'that which employs time, attention, and labor.'" The term "profession" signifies an employment requiring a learned education, as those of law and physics, and is applied to a calling which requires learning and special preparation in the acquirement of such knowledge and skill. [Commonwealth ex rel. v. Mayor of Philadelphia, 10 Pa. C. C. 1. c. 147.] The term "profession," in its broader meaning is defined by Webster to be "the occupation, if not mechanical, or agricultural, or the like, to which one devotes one's self; the business which one professes to understand, and to follow for a subsistence; calling; vocation; employment;" quoted in Betz v. Maier, 33 S. W. (Tex.) 710.

In the case of Holy Trinity Church v. United States, 143 U. S. 457, it is said: "The act of February 26, 1885, 'to prohibit the importation and migration of foreigners and aliens under contract or agreement to perform labor in the United States, its Territories, and the District of Columbia,' 23 Stat. 332, c. 164, does not apply to a contract between an alien, residing out of the United States, and a religious society incorporated under the laws of a State, whereby he engages to

remove to the United States and to enter into the service of the society as its rector or minister."

In United States v. Laws, 163 U. S. 1. c. 266, is the following: "One definition of a profession is an 'employment, especially an employment requiring a learned education, as those of divinity, law and physic.' [Worcester's Dictionary, title profession.] In the Century Dictionary the definition of the word 'profession' is given, among others, as "A vocation in which a professed knowledge of some department of science or learning is used by its practical application to the affairs of others, either in advising, guiding, or teaching them, or in serving their interests or welfare in the practice of an art founded on it. Formerly, theology, law and medicine were specifically known as the professions; but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed attainments in special knowledge as distinguished from mere skill. A practical dealing with affairs as distinguished from mere study or investigation; and an application of such knowledge to uses for others as a vocation, as distinguished from its pursuit for its own purposes.' " In Miller v. Kirkpatrick, 29 Pa. St. 1. c. 229, it is said: "The term 'profession' . . . is especially applicable to persons who teach or practice in law, physic, or divinity."

The constitution of the State of Texas exempts the place of business of the head of a family from forced sale. In the case of Shryock & Rowland v. Latimer, 57 Tex. 1. c. 677, the court, construing the exemption, said: "The head of a family must have a calling or business to which the property is adapted and reasonably necessary. Such property must be used as a place to exercise the calling or business of the head of the family.

"The words 'calling' and 'business' are evidently

used in the constitution in a very broad sense when taken together, but the signification of each one is uncertain; yet we are to infer that they were not used to designate the same thing.

"Taken together, they certainly embrace every legitimate avocation in life by which an honest support for a family may be obtained.

"The former was probably used in the sense of 'Profession' or 'trade,' which would embrace all such employments as by course of study or apprenticeship in any of the learned professions, liberal arts, or mechanical occupations, a person has acquired skill or ability to follow, and which has become practically a matter of personal skill, in its nature not temporary in existence."

Strictly speaking, Dr. Schwarz was engaged, at his residence, in the practice of his profession as a physician, in the discharge of his professional obligations to those who called upon him for medical advice or treatment. In a narrow or restricted sense of the term, he was perhaps not engaged in business. But the definition of the term given by the lexicographers and sanctioned by the courts is broad enough to comprehend any employment, vocation or calling in which one may engage for a livelihood or profit, and hence broad enough to take in the practice of physic, law or divinity. Whether or not Dr. Schwarz violated the covenants must be ascertained by a proper construction of the following clause in the covenants, to-wit, "nor shall said lot or any part thereof ever be used or occupied for trade or business of any kind whatever." The covenantor evidently, from the very language used, intended to exclude from the lot all and every kind of business and every occupation or calling which can, within the broadest definition of the term, be classed as business. Any other construction of this clause of the covenant, it seems to us, would do violence to its

language and tend to defeat its evident purpose. This view is strengthened by a consideration of the object and purpose of this and the other restrictions and covenants which were to make "Fullerton's Westminster Place" a strictly exclusive residence place and we are bound to conclude that Dr. Schwarz's evidence shows he breached the covenant prohibiting the occupation of lot No. 18 for business purposes. But we do not think the evidence warrants the court to enjoin Dr. Schwarz from receiving patients at his residence at all, or that the court should say he shall not set aside a special room in his residence where patients may be received if they must call. It would be ridiculous and inhuman to hold that no patients should be admitted to Dr. Schwarz's residence under any circumstances whatever, or to hold that he cannot set apart a room for the purpose of seeing such persons as must of necessity call at his residence for the purpose of consulting him professionally, or such as may be taken there for emergency treatment. The fact that Dr. Schwarz and his wife have set apart a room in their residence for the express purpose of receiving patients, and that he has let his patients know they may call upon him there professionally between two and four o'clock p. m., of each week day, and the fact that he has advertised this particular room as his office by tacking his professional card on the door, constitutes the business he is conducting at his residence in violation of the covenant. By the judgment of the circuit court, Dr. Schwarz is perpetually enjoined from habitually receiving, treating or consulting with his patients at his residence, and from displaying on the premises any sign or device indicating that Dr. Schwarz is so using his premises, and from inviting, directly or indirectly, his patients to visit him at the premises for treatment or consultation as a physician, either by the use of cards, telephone books, or any other form of announcement, or by word

of mouth. The covenants run for twenty-five years only, therefore, the judgment is erroneous in that it enjoins defendants perpetually. We also think Dr. Schwarz should not be prohibited from advertising his place of residence in the telephone books; to do so would prohibit him and his patients the use of this most convenient means of communication with each other. The judgment enjoins Dr. Schwarz from habitually receiving, etc., his patients at the premises. According to the evidence, patients are in the habit of calling at the residence of their physicians whether invited to do so or not. The doctor may and should oppose and discourage such calls, but what is he to do when a call is made? He should not drive a sick person, who calls on him for relief from pain and suffering, from his door, and if he administers to him instead of ordering him off, he should not be charged with keeping an office and doing business at his residence, in violation of the covenant. We think the use of the word "habitually," in the prohibiting order of the court is unfortunate; the word has an indefinite meaning. One call a month in every month in the year can as well be characterized as habitual as one call a day for every day in the year.

We will not reverse the judgment and remand the cause with directions but proceed to enter here such a decree as the evidence seems to warrant; it is therefore considered by the court that defendants and each of them, for and during the life of the restrictions, be and they are hereby enjoined and prohibited from maintaining any office upon the premises for the purpose of receiving or treating any patient who may call upon Dr. Schwarz to be treated by him, or to consult him professionally; and they are enjoined from advertising in any manner, or by any means whatever, the fact that Dr. Schwarz will receive patients or persons at the premises for the purpose of professional treatment, or

consultation; and Dr. Schwarz is enjoined and prohibited from carrying on his business as a physician at or upon the premises. All concur.