NATHAN EASTERBROOK, JR., ET ALS. *vs.* THE HEBREW
LADIES ORPHAN SOCIETY.

Third Judicial District, New Haven, January Term, 1912.
HALL, C. J., PRENTICE, THAYER, RORABACK and WHEELER, Js.

The primary rule of interpretation of restrictive covenants is to gather the intention of the parties from the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met. The expressed intent of the parties, when discovered, is the controlling fact. Unexpressed intent will be unavailing.

If the language of a restrictive covenant, when read in the light of the context and surrounding circumstances, is still of doubtful meaning, it will be construed against rather than in favor of the covenant. Restrictive covenants, being in derogation of the common-law right to use land for all lawful purposes, will not be extended by implication.

Where a particular enumeration is followed by general descriptive words, the latter will be understood as limited to matters and things of the same general kind or character as those specially enumerated, unless there is something to show a contrary intent.

The word "business" is one which is used with widely variant mean-

ings. In its broad sense it includes everything about which one can employ his time, attention, or labor; in a narrower sense it denotes an occupation pursued for the purpose of livelihood or profit.

In 1834 certain owners in common of a tract of land in New Haven executed a mutual restrictive covenant by which an open square was reserved, with driveways about it and lots fronting on the driveways. As to the lots on the longer sides of the square, a building line was imposed, and any building except "a handsome two story dwelling house with or without wings" was prohibited. As to all the lots it was provided that "neither they nor their heirs or assigns shall or will at any time hereafter erect or permit upon any part of any or either of the said twenty lots any livery stable, slaughter house, smith shop, forge, furnace, steam engine, brass foundry, nail, or other iron factory, or any manufactory of gunpowder, glue, varnish, vitriol, ink or turpentine, or for dressing, tanning, or preparing skins, hides, or leather, or any brewery, distillery, public museum, theatre, circus, place for the exhibition of animals or any other trade or business, dangerous or offensive to the neighboring inhabitants." *Held* that the maintenance of a home for orphans and aged persons to be supported chiefly by charity, but in part by payments from inmates, was not the conduct of a "business" within the intent and meaning of this covenant, and therefore not forbidden by it, although the neighboring inhabitants might regard it as offensive. (*One judge dissenting.*)

Argued January 17th—decided March 7th, 1912.

SUIT to restrain the defendant from continuing to operate an orphan asylum and home for the aged on certain lots on York Square in New Haven, in alleged violation of the terms of the deed under which the defendant acquired its title and of the conditions and restrictions contained in an earlier deed of trust of which the defendant had notice, and also for damages, brought to and tried by the Superior Court in New Haven County, *Gager, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff. *No error.*

In 1834 four persons, all residents of New York, and the owners in common of a tract of land in New Haven, caused it to be surveyed, and plotted upon a map show-

ing in the central portion a square three hundred and sixty-five feet in length and one hundred and twenty-seven feet in width, surrounded by an avenue or carriageway, and fronting upon this way sixteen numbered lots. Upon the map were also shown two other ways leading from the one surrounding the square to nearby public streets, one lying easterly and the other westerly of the tract, and in addition certain passageways in the rear, or by the side, of certain lots. There were eight lots shown which did not face directly on the square. March 15th of that year they joined in the execution and delivery to four other persons as trustees, and to their successors in said trust to be named from time to time as occasion should require in a manner prescribed, of a conveyance of the land thus laid out as a square and for use as avenues or carriage or passage ways. By the terms of the trust, the trustees were required to enclose and improve the square in a manner provided, and to forever maintain and care for it, to pay all taxes, charges or assessments which might be laid or levied against the land conveyed, to permit the owners of the sixteen lots facing the square and their respective tenants and families to have the enjoyment of it as a place of resort and recreation subject to such rules and regulations as the owners of these lots should from time to time prescribe, and to allow certain passageways to be used in connection with certain lots. Provision was made for the reimbursement of the trustees for their expenditure by the owners of the sixteen lots, and for means of enforcing such reimbursement.

The instrument contained a covenant binding upon the grantors, their heirs and assigns, and expressly attached to the lots concerned, that there should not be erected upon any one of twelve of the sixteen lots, being the lots lying upon the two sides of the square, any building except "a handsome two story dwelling

house with or without wings," and that such house should be located back of an indicated building line. This covenant did not extend to the lots facing the short sides or ends of the square. The defendant's ownership is confined to lots last described, and they are not subject to this covenant.

Another covenant is that recited in the opinion. Like the one last mentioned, it is expressed to bind the grantors, their heirs and assigns, and it is provided that it attach to and run with the land upon which it is imposed, which in this case is all save four of the twenty-four lots peculiarly situated and with which we are not concerned. The defendant's premises are included in those against which it runs.

There are no other restrictive covenants in the instrument, and its remaining provisions do not concern the questions presented by the record.

The plaintiffs are the present trustees. On the north side of the square stand three dwelling-houses, occupied by their owners for residential purposes. Upon a lot at the west end is an unoccupied dwelling. Two of the lots on the south side have occupied dwelling-houses upon them. The other four have been condemned for public school uses, and the New Haven High School and the Boardman School stand upon them. In the condemnation, damages were assessed to all of the owners of lots facing the square for the loss of their easements. The ways originally laid out around the square and leading therefrom to the nearby streets have become public highways.

The defendant is a corporation. May 10th, 1910, it acquired title to three lots lying at the west end of the square, and upon which stands a dwelling-house theretofore occupied for residential purposes. It proposes to use and occupy the premises for a home for orphans and aged persons as a purely charitable and

benevolent undertaking. It expects to rely largely upon charitable contributions for the support of the institution, although such of its inmates as are able will be required to make such small payments as they reasonably can. There is no intention to conduct it for profit. The defendant has done nothing as yet to carry its plans into execution, and they are not yet fully formulated. It is probable that a superintendent will be employed to manage the institution, and that other assistants and servants will also be employed at customary wages. It is thought that with the institution in full operation there will be from twenty to thirty persons residing therein. Visits to inmates by friends and relatives will be allowed under regulations not yet made. The matter of enlarging the present buildings, or of erecting new ones, has not been discussed, and there is no present intention as to that matter.

Other facts contained in the finding need not be recited, as they are not pertinent to any question discussed in the opinion.

*Eliot Watrous* and *Thomas M. Steele*, for the appellants (plaintiffs).

*John K. Beach* and *Frederick H. Wiggin*, for the appellee (defendant).

PRENTICE, J. It is unquestioned that the plaintiffs have no right to the relief prayed for except as such right arises from a violation of the restrictive covenant running with the land contained in the deed of 1834, by the terms of which the grantors, the predecessors in title of all of the parties to this action, their heirs and assigns, covenant and agree that "neither they nor their heirs or assigns shall or will at any time hereafter erect or permit upon any part of any or either of the

said twenty lots any livery stable, slaughter house, smith shop, forge, furnace, steam engine, brass foundry, nail, or other iron factory, or any manufactory of gunpowder, glue, varnish, vitriol, ink or turpentine, or for dressing, tanning, or preparing skins, hides, or leather, or any brewery, distillery, public museum, theatre, circus, place for the exhibition of animals or any other trade or business, dangerous or offensive to the neighboring inhabitants."

The plaintiffs assert, and the defendant denies, that the latter's proposed use and occupancy of its recently acquired land within the tract covered by said deed is one violative of this covenant. Here is presented an issue fundamental to the case, and one whose determination in favor of the defendant is necessarily fatal to the plaintiffs' right of recovery, regardless of all other considerations. Its determination depends upon the language of the covenant defining the prohibited uses. It is clear that neither the purposes to which the defendant proposes to put its premises in the conduct of a home for orphans and the aged, nor the acts and things proposed to be done thereon in the conduct of the projected institution, are of such a character as to bring its use and occupancy of the property into the category of activities forbidden by special enumeration. It is equally clear that this use and occupation cannot be brought within the purview of the general descriptive language immediately following the specific enumeration as being that of a "trade." Manifestly it cannot be brought under the ban of the covenant unless it is first of all to be regarded as a "business" within the intent and meaning of that word as therein used.

The word "business" is one which is used with widely variant meanings. It is used broadly to signify "that which busies, or engages time, attention, or

labor, as a principal serious concern or interest." Webster's New International Dictionary. In this sense it embraces everything about which one can be employed. *People ex rel. Parker Mills* v. *Commissioners of Taxes*, 23 N. Y. 242, 244. It is often used in a much narrower sense to denote "that which occupies the time, attention, and labor of men for the purpose of livelihood or profit." Bouvier's Law Dictionary; *Goddard* v. *Chaffee*, 2 Allen (84 Mass.) 395; *Harris* v. *State*, 50 Ala. 127, 130. In this sense it signifies " a calling for the purpose of a livelihood" or profit. Anderson's Law Dictionary, 141. It is also used with various other shades of meaning, as with especial reference to mercantile or commercial activities, or to commercial or industrial enterprises, or as synonymous with trade. Webster's New International and Century Dictionaries.

The term thus being one of ambiguous and uncertain meaning, it becomes necessary to determine, as best we may, the meaning in which it was used in this covenant. "The primary rule of interpretation of such [i. e. restrictive] covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement, but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met." *Kitching* v. *Brown*, 180 N. Y. 414, 427, 73 N. E. 241. The controlling fact, when discovered, is the expressed intent. Intent unexpressed will be unavailing. In the discovery of the expressed intent there are certain accepted principles of construction to be observed.

One is, that the words used are to be taken in their ordinary and popular sense, unless they have acquired a peculiar or special meaning in the particular relation in which they appear, or in respect to the particular subject-matter, or unless it appears from the context

that the parties intended to use them in a different sense. *Hall* v. *Rand,* 8 Conn. 560, 568; *First Society of Waterbury* v. *Platt,* 12 Conn. 181, 188; *Moran* v. *Prather,* 23 Wall. (U. S.) 492, 499; *Hawes* v. *Smith,* 12 Me. 429, 432.

Another is, that if the language of a restrictive covenant, when read in the light which the context and surrounding circumstances throw upon it, remains of doubtful meaning, it will be construed against rather than in favor of the covenant. Brown on Covenants Running with Land, 125; *German* v. *Chapman,* L. R. 7 Ch. Div. 271, 276; *Clark* v. *Jammes,* 87 Hun (N. Y.) 215, 217, 33 N. Y. Supp. 1020; *Kitching* v. *Brown,* 180 N. Y. 414, 427, 73 N. E. 241. Such covenants being in derogation of the common-law right to use land for all lawful purposes that go with title and possession, they are not to be extended by implication. *Brigg* v. *Thornton,* L. R. (1904) 1 Ch. 386.

Again, it is a recognized rule that where a particular enumeration is followed by general descriptive words, the latter will be understood as limited in their scope to matters and things of the same general kind or character as those specified in the particular enumeration, unless there is something to show a contrary intent. *St. Joseph* v. *Porter,* 29 Mo. App. 605, 608; *Hickey* v. *Taaffe,* 99 N. Y. 204, 209, 1 N. E. 685; *Bailey* v. *Close,* 37 Conn. 408, 411; *Hudson* v. *Whiting,* 17 Conn. 487, 490. When no such contrary intent appears, the general words will be construed with reference to the context, and the specific terms with which the general are associated in the context will control the meaning to be given to the more general expression used in their immediate connection. *Pardee's Appeal,* 100 Pa. St. 408, 412.

It is apparent, from an examination of the instrument in its entirety, that the parties had it for their

purpose to make the tract which they owned between them desirable and attractive for residences. It is equally obvious that it was intended that the instrument should embody all the measures which the parties regarded as necessary to effectuate the result sought to be secured. It is an exceptionally lengthy document, is drafted with uncommon precision, deals with a great variety of details, and unmistakably evinces unusual care and thought as respects both the matters to be provided for and regulated and the manner of that provision and regulation. It is impossible to read it and not come to the conclusion that it is the product of a thoughtful consideration of the situation and a solicitude to specifically and clearly embrace in its provisions all those regulations and restraints which at the time were deemed needful to accomplish the end sought.

It well may be that the foresight of these grantors nearly eighty years ago has not proved equal to the changed conditions of to-day, and that in the lapse of years it has developed that the provisions made in 1834 are inadequate to secure the results then sought after; but the restrictions of the instruments as they were made cannot be enlarged by implication or extended beyond their original intent in order that the general purposes of the covenanting parties may be effectuated under the new conditions. To make such extension would be to make a new contract for the parties in the place of one they did make. *First Society of Waterbury* v. *Platt*, 12 Conn. 181, 188.

Although the parties entertained the purpose of making the tract a desirable one for residential purposes, it is obvious that they did not contemplate measures which would compel it to be and remain an exclusively residential neighborhood. In other words, it was not regarded as a necessary condition to the accomplishment of the purpose in view that all trades and business

should be barred. The ban was placed upon certain kinds of trades and business only. The provisions of the instrument which attempt a regulation of the uses to which the property might be put are few. They are confined to one that no building other than a two-story dwelling with or without wings should ever be erected on the front of twelve of the twenty lots, not including the defendant's, and those back of a fixed line, and the restriction now under consideration.

Examining this restriction, we find a specific enumeration of some twenty-six different kinds of activities. There is not one of them which is not regularly conducted for livelihood or profit. The only one conceivably conducted otherwise is a public museum; but it well may be doubted whether a public museum conducted for altruistic reasons entered into the conception of these parties in 1834. Whether so or not, it is quite certain that it was the sort of public exhibition which was maintained for reward that they intended to reach. Activities in which one may be busied as a principal concern or interest of his life, and which lie outside of the sphere of business conducted as a means of livelihood or profit, include for the most part or entirely those which are charitable, religious, educational, or social in their nature. The category of forbidden activities contained in the covenant includes no one partaking of either of these characters. To say that the word "business," used as a general descriptive term in the immediately following general descriptive language, is to be interpreted in the most comprehensive of its several appropriate meanings without some affirmative reason for so doing, is violative of the accepted rule of construction under such conditions, which we have already noticed.

If we look for such reasons, they are entirely lacking, unless, indeed, we assume to discover it in the secret

and unexpressed intent of the parties. The specific enumeration does not indicate it certainly, and there is nothing in the general tenor and scope of the instrument or in any portion of it which does so. On the contrary, the use of the term "business" in connection with that of trade, and unassociated with any other more comprehensive word, forcibly suggests that it was not within the purpose of the parties to forbid uses of the property which were charitable, religious, educational, or social in their essential character, or other uses, if any there be, which are not a means of livelihood or profit. The word "business" in its ordinary and common use among men, is employed to designate human efforts which have for their end living or reward. It is not commonly used as descriptive of charitable, religious, educational, or social agencies. Can it be imagined readily that any one of these parties would have referred to a charitable institution, or a church building or adjunct, or a free school, or a social club, as a business? We imagine not, and it is no less improbable that they employed that term in the instrument in question in the permissible broad sense of it which would include such activities.

Further reinforcement of this view is found in the characteristic features which mark the several forms of business specifically forbidden, and these features furnish significant indications of the basic reasons for their respective prohibition. Each one of them is either inherently dangerous, notoriously offense to the sense of smell, or naturally unpleasantly noisy in their operation, obnoxious to a prevailing moral sense, or attractive of crowds of people, more or less heterogeneous in character. These features are peculiarly incident to enterprises carried on for their return in pecuniary reward. They are not such as could well be expected to attach to other activities. No one of them, save

possibly the last, could by any reasonable stretch of imagination be anticipated as attending the conduct of any charitable, religious, educational, or social undertaking, and that one would scarcely present itself in any objectionable form under conditions existing in New Haven in 1834. It is obvious, and the *ejusdem generis* principle of construction leads to the same conclusion, that it was obnoxious features of the same general nature as those characterizing the kinds of business enumerated, at least in that they are inherent in the nature of the business, and do not arise from the personal attitude toward the business of those affected unpleasantly by it, that was within the intention of these parties to prevent, and therefore the inference becomes all the stronger that it was business in the ordinary sense that it was intended to reach.

The plaintiffs appeal to two English cases in support of their contention that the defendant's proposed enterprise is to be classed as a business. Both of these were cases where general descriptive language only was used in the covenant, and the question presented was for that reason a distinctly different one from that before us. See *Bramwell* v. *Lacy,* L. R. 10 Ch. Div. 691; *Rolls* v. *Miller,* L. R. 27 Ch. Div. 71. We have no occasion, therefore, to inquire whether or not we should be satisfied with their reasoning as applied to their facts. The two remaining cases referred to by the plaintiffs' counsel in support of their claim now under consideration are in nowise inconsistent with our conclusions. Both were cases of private schools conducted for profit. See *Kemp* v. *Sober,* 1 Sim. New Ch. 517; *Doe, dem. Bish* v. *Keeling,* 1 Mau. & Sel. 95.

We are of the opinion that the defendant's projected institution, in so far at least as its proposed purposes and method of conduct is indicated in the record, will not be a business within the meaning and intent of

the restrictive covenant in question, and for that reason will not be within its prohibition. This conclusion renders it unnecessary to consider other questions presented by the appeal and argued.

There is no error.

In this opinion HALL, C. J., THAYER and RORABACK, Js., concurred.

WHEELER, J. (dissenting). Both parties derive title through a trust deed which laid out a private park, called a "square," with streets around its four sides and lots fronting thereon, and provided for the maintenance of the streets and square by making it a charge upon the lots. One covenant restricted the building to be erected upon each of the twelve lots on two sides of the square to any except "a handsome two story dwelling house." Another prohibited the carrying on upon all of the sixteen lots surrounding the square of certain designated occupations and concluded, "or any brewery, distillery, public museum, theatre, circus, place for the exhibition of animals or any other trade or business, dangerous or offensive to the neighboring inhabitants."

The defendant, with full knowledge that the plaintiffs intended to enforce this covenant against it, purchased the three lots at the west end of the square, and purposed using them for a home for orphans and aged persons. The finding is that there has been no such change in the neighborhood that the restrictions of this covenant are no longer enforceable in equity. The only question of serious moment in the case is whether a home for orphans and aged persons is within the prohibition of the restriction "or other trade or business, dangerous or offensive to the neighboring inhabitants."

The finding is that the proposed use of the premises

is offensive to the neighboring inhabitants. And the facts detailed show that this conclusion is not an unreasonable one. The question thus narrows to whether a home for orphans and aged persons is a "business" as the term is used in this restrictive covenant.

The ultimate object is to give the word such an interpretation as will carry out the intention of the parties to the deed. *Seery* v. *Waterbury*, 82 Conn. 567, 569, 74 Atl. 908. In order to ascertain and carry out this intention, courts have adopted certain rules of construction. Language is to be taken in its ordinary and natural meaning in connection with the situation and surrounding circumstances. If the language is capable of two or more meanings, and doubt remains after all legitimate aids have been used, the grant should be taken most strongly in favor of the grantee and against the grantor. *Sweeney* v. *Landers, Frary & Clark*, 80 Conn. 575, 580, 69 Atl. 566. If a particular enumeration is followed by general descriptive words, and no contrary intent appears, the latter will be limited in their scope to matters and things of the same general kind or character. These rules were adopted to aid in carrying out the intention of the parties; they cannot be invoked to defeat it. The intention appears as a matter of fact without the aid of these rules, and, properly applied, the rules of construction support this intention.

Another rule of universal applicability and primary importance is that where the parties have for many years placed a practical construction upon the meaning of a restrictive covenant, open to two constructions, this will, in the absence of strong proof of a contrary intention, go far to establish this as the construction intended by the parties. *Watson* v. *New Milford*, 72 Conn. 561, 565, 45 Atl. 167. The majority opinion rests its conclusion mainly upon the rule of construction re-

ferred to, that the use of the word "business" in asso-
ciation with trade and in connection with other enu-
merated occupations makes it clear that the use of the
word "business" includes all gainful occupations, the
obnoxious features of which are within this restrictive
covenant.

This is a misconception of the rule. Applied in its
broadest sense, it would limit the word "business"
to kinds of business of the same general kind or charac-
ter as trade and the particularly enumerated occupa-
tions. It would not extend its use beyond their scope.
"Trade," in its ordinary sense, means buying and sell-
ing. These enumerated occupations include such as
are dangerous, apt to become nuisances, productive
of noise, offensive to the moral sense of a large class of
people, and such as gather large numbers of people.
Neither of these classes, except the public museum,
would include that vast number of occupations in
which men gain their livelihood which are neither
trade nor the occupations specified.

Because these occupations are gainful, it does not
follow that the word "business" includes merely gain-
ful occupations; on the contrary, this rule would limit
business to occupations of the kind and character
specified and exclude all others. If this was an instance
for the enforcement of this rule of construction, and
the word "business" were to include only the kinds of
business particularly named or described, it could not
properly be confined to gainful pursuits, since one of
the enumerated classes is a public museum. A "mu-
seum" is "a repository or a collection of natural, scien-
tific, or literary curiosities or objects of interest, or of
works of art." Webster's New International Dic-
tionary. In the Bibliography of Museums we find a
classification which appears to have always obtained
in this country: the public and the private museum, the

public conducted through philanthropic motives, the private sometimes through philanthropy, more often for individual or institutional gratification or benefit, and infrequently for commercial motives. In early days our principal cities had each a public museum founded and supported by private generosity. The earliest collection is said to have been that formed at Norwalk, Connecticut, prior to the Revolution, which President Adams visited; his interest culminating in the founding of the American Academy of Arts and Sciences. Later, other museums were founded and maintained by private or governmental bounty and open to the public. So that in 1834 we had in this country both public and private museums. A similar distinction existed between the public and the private libraries. Neither the public museum nor library was operated for a profit.

What was true here was true throughout the civilized world. There were in New York City, in 1834, at least two places of amusement for the exhibition of wax-works, curiosities, and animals. These were commercial enterprises of a private character. They were called "museums," as, Scudder's Museum. In the sense of the definition they were not museums. Neither then, nor at any time before or since, have museums of this kind been designated as public museums. They had none of the characteristics of the public museum, nor, indeed, of the many private museums not conducted for gain. So that this covenant specifically restricts a use by a business activity of a philanthropic character, and if the word "business" is governed in its meaning, as the majority opinion holds, by the enumerated occupation, public museum, it must include those businesses which are not conducted for gain.

The parties intended to make of the tract included in the trust deed a residential section of the better

class. For this purpose the large square was laid out, a place of beauty, recreation, and health for the benefit of those living around it, adding appreciably to the value of each adjoining lot. It is our duty to so construe the covenant against business that this intention may be fulfilled.

In its more limited sense, the word "business" is used to denote occupations carried on for pecuniary reward. In its more general or common use, it denotes not only all gainful occupations, but all occupations or duties in which men engage. *Rolls* v. *Miller*, L. R. 27 Ch. Div. 71, 88; *Bennett* v. *Hebbard*, 74 N. H. 411, 68 Atl. 537; *Semple* v. *Schwarz*, 130 Mo. App. 65, 109 S. W. 633. The enumeration of certain occupations, and then adding the generalization "or any trade or business," was plainly intended to cover every form of human activity. Business is not used in the sense of trade, nor intended to be confined to the classes enumerated. It has an individual meaning and existence. And this the majority opinion concedes when it extends its meaning beyond trade and the scope of the enumerated occupations to every form of gainful activity. And the authorities give to the word when used in such a covenant this individual meaning.

Which meaning of the word "business" will best promote the purposes of this deed preserving the residential character of this square and keeping out activities dangerous or offensive to the neighboring inhabitants? The narrow view, confining it to trade and to occupations of the enumerated character, or to gainful occupations, thus opening the square to hundreds of activities which may prove dangerous or offensive to the neighboring inhabitants, although belonging to no gainful pursuit, by bringing crowds within the square, to disturb its peace, overrun its park, diminish the value of the lots and residences, and thus negate

the purposes of the trust deed; or the broader view of business, which would keep out every form of activity, dangerous or offensive to the neighboring inhabitants, exercising a reasonable judgment? There can be but one answer. The plain intent of the deed should not be defeated through the use of rules of construction.

The practical construction of the parties is all but controlling in cases of ambiguity. From the date of execution of the trust deed to this action, seventy-six years, all of the owners of these lots fronting on the square have construed the word "business" in this broader sense, and no business of any kind, unless we should except that of a doctor, has ever invaded this square. In 1893, through condemnation proceedings, four of the lots on the south side of the square were taken for a high school by the city of New Haven, and the defendant's grantors and all other owners of lots affected by the trust deed were parties to the condemnation proceedings and were awarded damages for the loss of their easements. As the school was not carried on for a profit, damages must have been awarded upon the theory that the restriction against business included activities not gainful. This accorded with the practical construction always placed on this covenant. Under the construction of the court, it must follow that the city was under no liability to pay these damages, and that the lot-owners had no legal or moral right to receive them.

The work conducted by the defendant must be done by its paid officers or employees. As to these, this is the business of helping conduct a home for orphans and aged persons. If they are engaged in a business, why is not the joint result of their efforts a business? Those who own this institution do not live in it; those who live in it are either paid employees or lodgers paying a part

of the cost of their maintenance. The institution is a charity; it is also a "business" in the broad sense of the term.

Suppose the construction of the court stands. Then a private school for twenty is within the restriction, because conducted for a profit, while a public school of two thousand is not, because not conducted for a profit. Then a private sanitarium for twenty is within the restriction, while a public asylum for the insane with two thousand patients is not. But it is not necessary to multiply examples to demonstrate that so narrow a construction of the word "business" would defeat the very purposes of the trust deed and convert the square into a noisy neighborhood, and fill its streets and park with a multitude and perhaps with many undesirable persons.

It has, we believe, been all but uniformly held that the term "business" in such a covenant was not restricted to its associated term "trade" nor confined to the named occupations connected with it, nor confined exclusively to occupations pursued for gain. This was the law of England before this trust deed was executed, and we think the covenant in question was taken from those in use in New York, and they in turn substantially from England. Presumably its use in this country by expert conveyancers was with full knowledge of the construction placed upon the covenant by the English courts. At the foundation of all these decisions is the controlling issue: Shall the contracts of men, made within the law, be upheld and their intention as manifested by their contracts be fulfilled?

In *Doe, dem. Bish* v. *Keeling*, 1 Mau. & Sel. 95, 99, the covenant was against "any trade or business whatsoever." Lord Ellenborough, C. J., said: "The intention of the covenant was, that the house should not be converted to any purposes which might be likely to

annoy the neighbourhood, and by that means to depreciate its value at any future period." In *Bramwell* v. *Lacy*, L. R. 10 Ch. Div. 691, the restriction was against carrying on "any trade, business, or dealing whatsoever, . . . which may be or grow to the annoyance, damage, injury, prejudice, or inconvenience, of the neighbouring premises." The defendants operated a hospital for poor persons. It was a charity, though about half of its patients paid a small charge. The Master of the Rolls, Jessel, said (p. 694): "The first question is, is this a 'business' or 'in the nature of a business'? I have no doubt it is. . . . The question whether it is a business carried on for the purpose of profit or not, is not, in my opinion, material." In *Rolls* v. *Miller*, L. R. 27 Ch. Div. 71, the covenant was that lessees should not carry on "any trade or business of any description whatsoever." The defendants used the premises as a "Home for Working Girls." It was a charity. On appeal, Cotton, L. J., said (pp. 85, 86): "It is not essential that there should be payment in order to constitute a business. . . . It might well be that the defendants if they liked to do this in a house which they occupied might do so, but where they do so in a house in which they pay a superintendent in order to receive the girls, these girls are really lodgers . . . Although the lodging is given gratuitously, what is being done must be considered as carrying on the business of a lodging-house." In *Semple* v. *Schwarz*, 130 Mo. App. 65, 69, 109 S. W. 633, the covenant was, "nor shall said lot or any part thereof ever be used or occupied for trade or business of any kind whatever." The court said (p. 77): "The covenantor evidently, from the very language used, intended to exclude from the lot all and every kind of business and every occupation or calling which can, within the broadest definition of the term, be classed as business. Any other con-

struction . . . would do violence to its language and tend to defeat its evident purpose."

The courts of New York have given the word "business" in similar covenants the same construction. *Rowland* v. *Miller*, 139 N. Y. 93, 34 N. E. 765; *Barrow* v. *Richard*, 8 Paige Ch. (N. Y.) 351; *Shryock & Rowland* v. *Latimer*, 57 Tex. 674; *Haskell* v. *Wright*, 23 N. J. Eq. 389. These are not cases of nonprofit activities, but they show the construction given the word "business" in similar covenants.

In *Evans* v. *Foss*, 194 Mass. 513, 80 N. E. 587, the court say of a similar covenant: The purpose of the restriction was to exclude business of any kind that might prove offensive or injurious to the character of adjoining lots or of the immediate neighborhood.

That was the purpose of the covenant before us. It is one not opposed to public policy and should be enforced. 2 Devlin on Real Estate (3d Ed.) § 991b, p. 1872.

In my opinion there is error in the judgment complained of.