HOSPITAL SAN JOSÉ, INC., ET AL., Petitioners, *v.* MINIMUM WAGE BOARD OF PUERTO RICO, Respondent.

Nos. 86 (84–101). Argued May 17, 1944.—Decided June 2, 1944.

Manuel García Cabrera, Clemente Ruiz Nazario, and Arturo Ortiz Toro for petitioners. M. Rodríguez Ramos, Acting Attorney General, Gabriel Guerra Mondragón, and Ismael Soldevila for respondents.

MR. JUSTICE TODD, JR., delivered the opinion of the court.

Upon stipulation of the parties approved by the court, these eighteen petitions for review were joined and the legal questions raised were argued and submitted in only one hearing and by virtue of one written brief. In fact they involve only one fundamental question, to wit: whether the Minimum Wage Board created by Act No. 8, 1941, (Laws of 1941, p. 302) has the authority or power to fix the minimum wage that the clinics and hospitals of Puerto Rico, as employers, have to pay to their non-technical employees, as it did by virtue of the Mandatory Decree No. 4, issued on May 18, 1943, and amended on November 15, 1943.

Before we consider and decide this question, it seems advisable to say that we only have before us as petitioners the institutions mentioned in the title and that, therefore, we can not consider the contention of the petitioners to the effect that the Minimum Wage Board lacks power to fix

the minimum wage of the employees of hospitals of the Insular or Municipal Government, whose salaries are fixed by the Legislature or the Municipal Assembly. The petitioners are all private entities and lack the personality to attack such power. Can it be maintained, as urged by the petitioners that Act No. 8 of 1941 is not applicable to private hospitals and clinics? Let us see its terms and purposes.

We shall begin by the definitions contained in §30 of the Act of the words "employer," "occupation," "business," "laborer," "employee," and "worker," in order to connect them with certain other Sections of the Act and thus determine what was the legislative purpose as to the extent of the powers conferred on the Minimum Wage Board. In its pertinent part, §30 provides that:

"The following definitions of words and phrases in this Act shall be accepted, unless otherwise deduced from the context thereof:

" 'Employer' includes every natural or artificial person engaged in industrial, commercial, *business*, agricultural, or public-service activities, who employs laborers, *employees, or workers, for pay, wage, salary, or any other form of compensation.*

" *       *       *       *       *       *       *

" 'Occupation' includes every work or labor in factories, mills, centrales, shops, *establishments*, manufactories, farms, plantations, ranches, transportation and communication enterprises, *and places of any kind where gainful work or business is done or transacted.*

" 'Business' includes every work or labor in warehouses, stores, *establishments, or places of any kind* where commercial transactions are made or *services are rendered for remuneration.*

*       *       *       *       *       *       *

" 'Laborer', 'Employee', 'Worker', include *every* manual worker, artisan, day laborer, clerk of a store, *and every person employed for remuneration in any occupation, business,* or industry.

"The terms included in this section shall not exclude any other term embracing agricultural, industrial, or commercial activities.

"The provisions of this Act shall not be applicable to persons employed as domestic servants." (Italics ours.)

The Declaration of Principles contained in the Act, and which we copy as a footnote [1], indicates that the fundamental public policy which the legislator had in mind was to improve the labor conditions detrimental to the maintenance of the minimum standards necessary for health, efficiency, and general well-being of workers in the different *occupations*, in the sense these are defined in §30, *supra*. Other Sections of the Act [2] strengthen the conclusion we reach that

---

[1] "Section 1.—(*a*) The Legislature of Puerto Rico hereby finds that the existence, *in the different occupations*, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers (1) causes commerce, agriculture, and industry to be used to spread and perpetuate such labor conditions; (2) constitutes an unfair method of competition in production and interchange; (3) implies the payment of wages which are insufficient to satisfy the minimum needs of workers; (4)· leads to disputes between workers and employers, obstructing the progressive development of Puerto Rican economy; and (5) *represents a state of manifest social injustice.*

"(*b*) It is hereby declared to be the policy of this Act, through the exercise by the Legislature of Puerto Rico of its power to pass laws for the protection of the life, health, and safety of workers and employees, to correct, and as rapidly as practicable to eliminate, the above-mentioned conditions in the different *occupations*, without substantially curtailing employment of earning power.

"(*c*) It is hereby declared to be the public policy of this Act to protect workers in their means of livelihood in such a manner that the carrying out of said purpose shall not destroy the very sources of employment and work. It is the public policy of this Act that the living standards of the workers be raised to a fair level in proportion as the economic standards of prosperity of the branches of production which employ them are maintained and grow by reason of the great earning power afforded by this very law, by any other legislation, or by the general economic conditions which may produce such results.

"(*d*) It is *further* declared to be the policy of this Act to insure the progressive development of agriculture and of the industries and *businesses* which operate in Puerto Rico, by endeavoring to give them assurance of conditions favorable to their economic stability and natural expansion, and, to that effect, the body created for carrying out the purposes of this Act shall fix wages, having due regard to the costs, the financial condition of industries and branches of production, the market fluctuations, and the special conditions prevailing in each locality, as well as the living and working conditions of the workmen." (Italics ours.)

[2] See §3 which imposes on the Board "the duty . . . . to study the wages, working hours, and labor conditions which prevail in the different *occupations*, *businesses*, and industries in Puerto Rico, and to make investigations regarding the *health, safety, and well-being of workers;*" (Italics ours); §4 which grants ample powers to the Board or any of its members to make investigation and

the public policy set forth in the Declaration of Principles is not confined, as the petitioners maintain, to the determination by the Board only of the minimum wages with regard to workers who perform agricultural, commercial, or industrial work and that we should apply the doctrine of "*ejusdem generis*" in construing the other phrases contained in the Act with regard to the words "agriculture, commerce, or industry." Relying on authorities we recently decided in the case of *People* v. *Del Valle*, 60 P.R.R. 180, that the doctrine of "*ejusdem generis*," as well as the maxim "*noscitur a sociis*," are rules of construction which should not be applied if upon so doing the legislative intent is changed, and in regard to the first we said: "It is not a rigid and inflexible doctrine that may and should be applied as a rule of

summon witnesses; §5 which imposes on every person, firm, partnership or corporation "employing laborers in Puerto Rico" (indistinctly and accepting the definition of workers given in §30, *supra*) the duty of furnishing the board with "all such reports, data, and statistics as the board may request in order to carry out the purposes of this Act", and "to permit any member of the board, or any duly authorized employee, investigator, or agent thereof, free access to the *buildings* factories, mills, shops, machinery, farms, plantations, properties, *and other establishments and places where any work is performed,* for the purpose of obtaining any information . . . . or to make any investigation of the labor conditions prevailing therein, or to make any examination of the books, reports, contracts, pay rolls, documents, or records in connection with the employment of laborers," and which imposes a penalty on every "employer, manager, agent, or person in charge of any agricultural, commercial, or industrial establishment, or of *any other place* where *any kind of work is performed*", who unjustifiedly refuses to appear before the board to give testimony, or who refuses to permit the entrance of any of the persons already mentioned to the establishments described, or who refuses to furnish such information as may be requested, or who prevents the examination of his books, pay-rolls etc,; §6 which provides that it should be the duty of this board to appoint a Minimum Wage Committee to investigate the labor conditions prevailing in such occupations, businesses, or industries in which the wages paid "are insufficient to satisfy the normal needs of workers and are detrimental to the maintenance of the minimum standard of living necessary for their health, efficiency, and general well-being," for which committee two representatives of the employer, two representatives of the workers in said occupation, business or industry and a fifth member in representation of the public interest, should be appointed; and it provides, further, that said committee should report its findings to the board, and what such findings shall include. (As to the scope of the powers conferred upon the committees appointed by the board, see *Luce & Co.* v. *Minimum Wage Board*, 62 P.R.R. 431.)

construction where such construction would result in defeating such legislative intent or purpose.'' (P. 183.)

The duties imposed on the board and on the minimum wage committees appointed thereby and the powers conferred upon them by the Act, are primarily inspired in the wish of our Legislature to improve the health, security, and well-being of workers, after said bodies have investigated the wages, working hours, and labor conditions prevailing in the different occupations, businesses, and industries in Puerto Rico. The only persons excluded from the provisions of the Act are those employed as domestic servants. Any defect or omission in the definitions of the different words or phrases included in §30, *supra,* should not be a ground for our construing the scope of the Act in such manner as would impair fundamental purpose of the same. As Mr. Justice Frankfurter said, speaking for the Federal Supreme Court, in the case of *Phelps Dodge Corp.* v. *Labor Board,* 313 U. S. 177, 185, in construing the scope of the National Labor Relations Act: ''Unlike mathematical symbols, the phrasing of such social legislation as this seldom attains more than approximate precision of definition. That is why all relevant aids are summoned to determine meaning. Of compelling consideration is the fact that words acquire scope and function from the history of events which they summarize.'' In the Federal Act the only definition of the word *''employee''* in an affirmative form was to the effect that said term ''shall include any employee'' and then in a negative form it excluded agricultural employees, those employed as domestic servants or any person employed by his father or husband. The Federal Supreme Court, construing the scope of the word ''employee,'' said in the case of *National Labor Relations Board* v. *Hearst Publication,* decided about a month ago, on April 24, 1944 (322 U. S. 111), that ''the broad language of the Act's definitions, which in terms reject conventional limitations on such conceptions as 'employee,' 'em-

ployer,' and 'labor dispute,' leaves no doubt that its applicability is to be determined broadly, *in doubtful situations,* by underlying economic facts rather than technically and exclusively by previously established legal classifications. . . . That term (employee), like other provisions, must be understood with reference to the purpose of the Act and the facts involved in the economic relationship.''

Our statute is also susceptible of this wide and comprehensive interpretation. In defining the words ''laborer,'' ''employee,'' and ''worker,'' it is said that they ''include every manual worker, artisan, day laborer, clerk of a store, and *every person employed for remuneration in any occupation, business,* or industry.'' The only persons excluded are ''those employed as domestic servants.''

The precarious economic situation generally prevailing among our working classes due to the inadequate wages which they have been receiving during a long time unquestionably led our Legislature to pass the Act creating the board that would fix the minimum wages necessary to guarantee, up to where it is humanly possible, better conditions of life, health, and security to said working classes.

██ The petitioners contend, however, that they are not businesses within the meaning given to said word by the Act itself. From a mere reading of the definition above copied it appears that they are wrong, since it expressly says that the word ''business'' includes . . . ''establishments or places of any kind where . . . services are rendered for remuneration.'' They also contend that some of the petitioners are non-profit charitable institutions (Hospital Presbiteriano, Auxilio Mutuo, St. Lukes Memorial Hospital), and that the others have suffered losses as well and could not exist if they were compelled to pay the minimum wages fixed by the board and that none of them can be considered as an industry.

The two cases cited by the petitioners to maintain that they do not constitute an "industry" (the only cases cited in their brief) are *Yocum* v. *Feld,* 176 So. 753, and *Western Pennsylvania Hospital* v. *Lichliter* (Pa. 1941), 17 A. (2d) 206. In the *Yocum* case it was decided that "Engaging in the practice of medicine or, . . . 'operating the profession of a physician,' is neither conducting a trade nor engaging in an industry, and therefore, an ordinance regulating trades and industries will not be held to apply to one 'operating the profession of physician.'" And in the *Lichliter* case. it was decided that, for the purpose of an act prohibiting injunctions in regard to labor disputes, a hospital is not an industry and its employees are not engaged in a single trade, craft or occupation and that, therefore, another act dealing with labor relations was not applicable to hospitals and its employees. Even though it deserves our respect, we are not bound to follow this jurisprudence, specially when this court has decided that "a hospital that habitually dedicates itself to the hospitalization and medical treatment of patients, and that renders these services to any patient who will pay the agreed price, and that contracts to render services upon payment to veterans, is and should be considered as a commercial establishment or enterprise for the purpose of the provisions of §1803 of the Civil Code." *Carrasquillo* v. *American Missionary Association,* 61 P.R.R. 837, 844. In said case, as in the case at bar, with regard to the hospitals already mentioned, it was argued that where charitable or benevolent institutions are involved they could not be considered as businesses; but we decided that: "The fact that in the same institution services are rendered free to insolvent persons does not deprive it of its character of a commercial establishment or enterprise."

From the evidence introduced before the respondent board at the hearings it appeared that the great majority of the petitioners have contracts with the State Insurance

Fund and with the Veterans; and that, although they devote a certain percent of their facilities to charity cases, they devote the greater percent to cases of paying patients.[3] From said evidence it appeared that the only hospital that can be exclusively considered as a charitable institution is the scarcely known "Castañer General Hospital," in the rural zone of Adjuntas, which does not admit paying patients. This hospital is not one of the petitioners and, therefore, we are not called upon to decide in this case whether the Legislature had the intention of including institutions of this kind within the provisions of the Act.

It is true that the *Carrasquillo* case, *supra*, was a tort action, but we see no reason to limit the doctrine set forth therein to said class of actions. In the present controversy a question of high public interest is involved which affects a great number of workers. The low wages paid by some of the hospitals and clinics, as it appeared from the evidence, constitute an eloquent demonstration of their insufficiency so that the employees affected may improve their living conditions, health, and general well-being, to such an extent that some of the petitioners admit that said wages could be raised and that they have even accepted collective bargains with the workers, leaving them pending approval until the board fixed the minimum wages.[4]

But the fact is that the question to be decided is not whether the physician's professional services constitute a business, but whether the petitioners, as institutions, do engage in business.

Notwithstanding this, we can say that there are cases supporting a doctrine contrary to the one set forth in the case of *Yocum* v. *Feld, supra,* cited by the petitioners, that

---

[3] In the case of *In re Dol's Estate*, 187 Pac. 428, it was decided that an institution of the same kind as the petitioner, Sociedad de Auxilio Mutuo, is not a "charitable or benevolent society."

[4] See pp. 88, 279, 97, 53, 231, 234, 345, 150, 165 and 169 of the record.

is to say, that the practice of the medical or legal profession constitutes a business.[5]

The Federal Supreme Court, in the case of *American Medical Association* v. *U. S.*, 317 U. S. 519, in which the question in controversy was whether the American Medical Association had violated the Sherman Anti-Trust Act upon performing certain acts tending to deny the Group Health Corporation, a mutual medical benefit corporation, the medical services and other facilities of said association, although it abstained from deciding whether a physician's practice of his profession constitutes a trade, did decide the question involved in these appeals upon deciding that the Group Health was a corporation engaged in business, stating (p. 528):

"Group Health is a membership corporation engaged in business or trade. Its corporate activity is the consummation of the cooperative effort of its members to obtain for themselves and their families medical service and hospitalization on a risk-sharing prepayment basis. The corporation collects its funds from members. With these funds physicians are employed and hospitalization procured on behalf of members and their dependents. The fact that it is cooperative, and procures service and facilities on behalf of its members only, does not remove its activities from the sphere of business.

"If, as we hold, the indictment charges a single conspiracy to restrain and obstruct this business it charges a conspiracy in restraint of trade or commerce within the statute. As the Court of Appeals properly remarked, the calling or occupation of the individual physicians charged as defendants is immaterial if the purpose and effect of their conspiracy was such obstruction and restrain of the business of Group Health."

And on page 536, upon deciding that the Clayton and the Norris–La Guardia Acts were not applicable to the controversy, it was said as to the interest of the petitioners that

---

[5] *Semple* v. *Schwarz*, 109 S.W. 633; *People* v. *Garlock*, 11 N.Y.S. (2d) 82; *Ex parte Galusha*, 195 Pac. 406. Cf. *O'Neill* v. *United Producers & Consumers Co-op.*, 113 P. (2d) 645; *Marsh* v. *Adams*, 12 N.Y.S. (2d) 691; *East Hill Cemetery Co.* v. *Thompson*, 97 N.E. 1038.

"Their objection was to its (Group Health) method of doing business," that the petitioners ". . . were interested solely in preventing the operation of a business conducted in corporate form by Group Health."

In the opinion delivered in that same case by the Court of Appeals for the District of Columbia, it is recognized that there are authorities which maintain that "for some purposes charitable hospitals are not engaged in trade, business or industry" and the *Lichliter* case, *supra,* is cited. Other cases are cited,[6] however, in which it has been decided that the establishment and operation of a hospital is a business.

In opposition to the doctrine established in the *Lichliter* case there are the decisions in *Wisconsin Employment Relations Board* v. *Evangelical Deaconess Soc.,* 7 N.W. (2d) 590 (Wisc. 1943) and *Northwestern Hospital* v. *Public Building Serv. Employees' Union,* 294 N.W. 215 (Minn. 1940).

In this last case the *Lichliter* case was expressly cited and, although it was distinguished by reason of the fact that the Pennsylvania hospitals received assignments from the State, it was said that in spite of that "we do not think that this relationship between the hospitals and the state is sufficient to classify the former in the exemption granted the latter." It was decided that a non-profit charitable corporation which operated a public hospital was an employer within the Labor Relations Act and that its scope was not limited to industries, stating (p. 217):

---

[6] In *Jordan* v. *Tashiro,* 278 U.S. 123, it was decided that the operation of a hospital is included within the meaning of the word "commerce" and "trade" as used in a Treaty authorizing Japanese subjects in the United States "to carry on trade" and "to do anything incident to or necessary for trade upon the same terms as native citizens"; *Lawrence* v. *Missen,* 173 N.C. 359, 91 S.E. 1036, 38, where it was said that "The establishment and conduct of hospitals for pay is now a recognized and established business"; in *Armendarez* v. *Hotel Dieu,* Tex. Civ. App., 145 S.W. 1030, 31, it was decided that as long as a hospital cares for patients who are charged in order to obtain income to carry out its charity work, it is carrying on a trade.

"The employer-employe problem is more far-reaching and to impute to the legislature a purpose to provide means for the adjustment of labor relations in industry only would be artificial. We are all aware that thousands are performing duties as employes in hospitals such as plaintiff which are the same as those done by employes in private industry. The position and rights of employes in a hospital are as important to the well-being of the whole community as that of a technical industrial employe. The simple fact is that employes are dependent upon their positions for a livelihood. This is true whether the employer is a charitable hospital or an automobile manufacturer."

The language used in the case of *Wisconsin Employment Relations Board, supra,* is not less strong and pertinent when the court says (p. 592):

"Is there any reason to suppose that the legislature intended that kitchen help, for example, who worked in a hotel or restaurant should have the right to organize and seek better wages and conditions of work through the state board while those doing similar work in a hospital should be barred from seeking similar objects through the mechanisms provided by the state? Problems arise between employers and employees in charitable institutions as well as in industry and there is a similar need in each for methods of arriving at a peaceful settlement of differences."

Summarizing, we can say that, having properly focused the primary question involved in these cases, the fact that in a hospital or clinic, private or partly benevolent, medical services are rendered by professionals, is not the predominant factor. In said institution employees are used who, because of the inadequate wage they perceive, fall within the purpose of the Minimum Wage Act. We should not establish a distinction or difference between the labor conditions that should prevail among the non-technical workers of hospitals and clinics and those that should prevail in other businesses. The legislative intent was to improve the economic conditions of the workers and employees in order to benefit them in their life, health, and general well-being. We can not accept that workers in hospitals and clinics should

be excluded from that purpose because medical services are rendered in those institutions, whether or not as charity work. The attention, health, and welfare that these institutions offer their patients depend, up to a certain extent, on enabling the employees and workers who work there to enjoy in turn the minimum wages which their own health and welfare require in order that they may fulfill the obligations in their charge. We decide, therefore, that the board acted within its power and authority upon fixing the minimum wages in its Decree No. 4.

The petitioners finally contend that the minimum wage as fixed is not supported by the evidence and that said wage and the labor conditions established by Decree No. 4 as amended are contrary to the evidence, there existing none to support them. We have carefully read the record of the hearings held before the Board and also the documentary evidence admitted and it is our opinion that the argument of the petitioners is lacking in merit. There was not only substantial evidence introduced before the Board but from the same it appears that the wages fixed and the labor conditions established can be satisfied and fulfilled by the petitioners.

The petitions for review are dismissed and the Mandatory Decree No. 4 issued by the Minimum Wage Board of Puerto Rico on May 18, 1943, and amended by said board on Nov. 15, 1943, is affirmed.